# THE STATE v. EDWARD POOR, Appellant.

### Division Two, March 7, 1921.

1. **INFORMATION:** Murder: Unknown Weapon. It is permissible to charge that defendant killed deceased "by some means, instrument and weapons to your informant unknown." And this is permissible although the evidence presents different ways and means by which the deceased might have been killed.

2. ————: **Affidavit: Knowledge Instead of Belief.** An objection to the prosecuting attorney's affidavit to an information that it is made according to his best "information and knowledge," instead of "information and belief," should be made by a motion to quash. But defendant's rights were not prejudiced by the use of the word "knowledge" instead of the word "belief." The statutory form is not mandatory.

3. **JUROR:** Opinion Formed from Newspaper Reports. The test of a juror's disqualification based on an opinion of defendant's guilt formed from reading newspaper reports is, whether or not, despite such opinion, he can render a fair and impartial verdict. A juror who, on his *voir dire* examination, said he had read an account of the murder in the county newspapers and had formed an opinion in regard thereto which it would require evidence to remove before he would believe that the defendant was innocent of the charge; that if selected on the trial panel he would hear all the evidence and give defendant a fair and impartial trial; that his mind was not made up either way, and that he would require the State to prove the case to his satisfaction beyond a reasonable doubt, will not on appeal, in view of the discretion vested in the trial court to determine the qualification of a juror in the first instance on the same basis as other facts are decided, be held to have been disqualified.

4. **INSTRUCTIONS:** Murder in First Degree: Convicted of Murder in Second Degree. A defendant who has been convicted of murder in the second degree will not be heard to complain of an instruction defining murder in the first degree.

5. ————: Comment on Evidence: Refusal. It is not error to refuse an' instruction asked by defendant which is clearly an improper comment on the evidence; and an instruction which segregates find them to be true, is an improper comment on the evidence and should not be given.

State v. Poor.

6. **MURDER: Corpus Delicti: Circumstantial Evidence.** All the elements of the *corpus delicti*, including the fact of the death of the person alleged to have been murdered, the criminal agency of the accused and the identity of the deceased, may be proved by circumstantial or presumptive evidence when direct proof is not obtainable. The evidence must be sufficient to produce conviction in the minds of the jury beyond a reasonable doubt that the person alleged to have been murdered is dead and that defendant was the criminal agent who caused his death; but these two elements of *corpus delicti* being thus established, the fact that the body found had been almost entirely consumed by fire and that what remained could not by positive evidence be identified as the body of deceased will not of itself exculpate defendant, but his criminal agency and the death of deceased may be made to rest upon the attendant circumstances and facts if sufficient to sustain a conviction beyond a reasonable doubt.

7. **PROVINCE OF JURY: Questions of Fact.** Our system of jurisprudence contemplates that jurors are as much superior to the courts in determining matters of fact as the courts are superior to them in determining questions of law. When the guilt or innocence of an accused is the subject for determination by a jury, they are the only competent judges of the sufficiency of the competent evidence to sustain a verdict.

8. **INDIFFERENCE OF DEFENDANT: Unusual Occurrence: Corpus Delicti.** Indifference of defendant, in the presence of unusual occurrences, to the burning of his brother's barn, in the immediate neighborhood of his residence, on the next night after the person alleged to have been murdered disappeared with defendant, and in whose ashes the charred remains of a human being were found, is significant, especially in homicide cases, and manifests a condition of mind not in accord with normal conditions.

9. **MURDER: Verdict for Second Degree.** Although the evidence shows that defendant, if guilty at all, was guilty of murder in the first degree, the jury is authorized by the statute to find him guilty of murder in the second degree, and there being substantial evidence to sustain their finding of guilty the courts will not concern themselves with the degree.

Appeal from Madison Circuit Court.—*Hon. Peter H. Huck*, Judge.

AFFIRMED.

*Jos. F. Chilton* and *C. P. Damron* for appellant.

(1)   A juror who on his *voir dire* says he has an opinion as to the guilt of the defendant based on reading a newspaper article containing a statement of all the evidence given on the preliminary trial of the defendant, is disqualified to sit as a juror in the case as a matter of law and as a matter of fact.   Sec. 5220, R. S. 1909; State v. Taylor, 134 Mo. 109; State v. Culler, 82 Mo. 623.   (2)   An instruction must be applicable to the pleadings and the testimony developed on the trial, and must be intelligible so as not to confuse the issues in the minds of the jurors.   Harrison v. Lakeman, 189 Mo. 608; State v. Riley, 100 Mo. 498; State v. Allen, 94 Mo. App. 508; State v. Williams, 184 Mo. 261; Moore v. Steigel, 50 Mo. App. 308; State v. Pettit, 119 Mo. 415. (3)   Proof that a homicide has been committed and that the defendant on trial had made previous threats against the deceased, is not sufficient to warrant a verdict for murder; hence, instruction No. 9 offered by defendant should have been given.   State v. Glahn, 97 Mo. 679.   (4)   Before a witness can be impeached, it must be shown that his testimony in court is different from some statement made by him out of court, and a defendant cannot be bound by statements and acts of third parties out of his presence.   State v. Brown, 247 Mo. 584; State v. Newcomb, 220 Mo. 63.   (5)   When a defendant is on trial for his life, counsel for the State should carefully refrain from any attempt to coerce the jury to convict, as by making an appeal to their passion and prejudice, or by reference to public sentiment regarding the case. The jury should convict on evidence that crime has been committed and not in order to satisfy the hopes of the relatives of the deceased, or to satisfy the demands of the people of the county in which the alleged offense was committed, although said people may "believe in the enforcement of law and order."   State v. Hess, 240 Mo. 147; State v. Brown, 247 Mo. 715; State v. Wigger, 196 Mo. 90; State v. Wellman, 253 Mo. 302; State v. Mil-

ler, 263 Mo. 326; State v. Jones, 249 Mo. 80. And where the defendant's guilt is not clearly established, much less objectionable argument will be held reversible. State v. Evans, 267 Mo. 163; State v. Hilton, 255 Mo. 170. (6) A verdict which is not based on clear and convincing evidence of the guilt of defendant, but upon suspicion and conjecture, evidencing passion and prejudice on the part of the jury, cannot stand. State v. Hall, 141 Mo. App. 707; State v. Clain, 154 Mo. App. 686; State v. Baker, 144 Mo. 330; State v. Bass, 251 Mo. 107. (7) To establish the *corpus delicti,* there must be substantial proof that deceased died from a wound unlawfully inflicted by defendant. Both the criminal act and agency of defendant must be shown. State v. Bass, 251 Mo. 107; State v. Gordon, 199 Mo. 561; State v. Nesenhener, 164 Mo. 461; State v. Crabtree, 170 Mo. 643; State v. Francis, 199 Mo. 671. (8) Accused is entitled to know the nature and cause of the accusation against him, and unless the information gives him this knowledge, it does not answer the end required by the constitution and law. Art. 2, sec. 22, Mo. Const.; State v. Nunley, 185 Mo. 102; State v. Gassard, 103 Mo. App. 143; State v. Birks, 199 Mo. 263. The information must charge a felonious striking or wounding. The homicide must be alleged to have been done feloniously. State v. Williams, 184 Mo. 261; State v. Green, 111 Mo. 585; State v. Feaster, 25 Mo. 326; State v. Herrell, 97 Mo. 105; State v. Woodward, 191 Mo. 617. The information must contain the allegation that the deceased came to his death as a result of the felonious act. Nothing can be supplied by intendment. State v. Hagan, 164 Mo. 654; State v. Brown, 168 Mo. 449. The information was not verified as required by law. Secs. 5057, 5059, R. S. 1909.

*Frank W. McAllister,* Attorney-General, and *C. P. Le Mire,* Assistant Attorney-General, for respondent.

(1) The information is sufficient. Kelley's Crim. Prac. sec. 484, p. 430; State v. Woodward, 191 Mo. 629;

State v. Williams, 184 Mo. 261; Commonwealth v. Webster, 5 Cush. (Mass.) 295; State v. Williams, 52 N. C. 446. (2) The evidence is sufficient to support the verdict. State v. Concelia, 250 Mo. 424; State v. Underwood, 263 Mo. 685. (3) The *corpus delicti* may be established by circumstantial evidence. State v. Concelia, 250 Mo. 421; State v. Barrington, 198 Mo. 112; State v. Vinton, 220 Mo. 100. The *corpus delicti* was established by the testimony in the case. State v. Henderson, 186 Mo. 483. (4) Instruction No. 3 is on murder in the first degree. Appellant was convicted of murder in the second degree and cannot complain. Instruction No. 9 when analyzed amounts to a comment on the evidence. It was properly refused. State v. Lewis, 264 Mo. 432; State v. Shelton, 223 Mo. 139; State v. Mitchell, 229 Mo. 697; State v. Sebastian, 215 Mo. 87. (5) Remarks of counsel complained of are not saved for review. State v. DeWitt, 191 Mo. 58; State v. Humfeld, 182 Mo. App. 643. (6) Appellant's assignment that the court erred in overruling defendant's challenge for cause to the juror, D. E. Pridy should be overruled. Pridy did not serve on the trial jury of twelve. State v. Brooks, 92 Mo. 575; State v. Rasco, 239 Mo. 557; State v. Robinson, 117 Mo. 659; State v. Reed, 137 Mo. 131.

WALKER, J.—Edward Poor was charged with murder in the first degree by information, in the Circuit Court of Madison County, in February, 1920, in having killed one Cleveland King in October, 1919. Upon a trial he was convicted of murder in the second degree, and his punishment assessed at ten years' imprisonment in the penitentiary. From this judgment he appeals.

Cleveland King, frequently designated in the record as "Cleve," had, with his wife Nora, formerly lived in the immediate neighborhood of the defendant. Gossip as to an improper intimacy between the latter and Mrs. King had occupied the ever-busy tongue of scandal for some time before the separation of King and his wife, which occurred in August, 1919. Upon this separation,

provoked, as admitted by counsel for appellant, by the scandal, she went to reside with her mother and step-father, who lived in the same neighborhood. On Saturday, October 25, 1919, she was in Fredericktown with her parents. As they went home that evening they met the defendant, who said he had heard that Cleve King had been telling some tales on him that he had to straighten up. The next day Cleve came to where his wife was staying. After a general conversation he and his wife went to the Trace Creek Church building in the vicinity (there being no services there at the time), to discuss their differences. A half an hour or more after their arrival there they agreed to a reconciliation and a renewal of their marital relations, when the defendant appeared, carrying a gun. He demanded that Cleve accompany him to Charley Hawkins's, who lived about two miles away, to straighten up certain tales he said Cleve had been telling on him. The wife testified that her husband denied the charges and went reluctantly; that the last time she saw him he was going down the road with the defendant toward the home of Andy Hale in the direction of Charley Hawkins's. Soon after they left, two men, corresponding in size and general appearance with the defendant and Cleve King, were seen by Andy Hale about one hundred yards or more distant, going down the public road which ran in the direction of Charley Hawkins's place. Hale did not at the time observe them with particularity sufficient to identify them as King and the defendant, but did notice that one was a small man and the other a large one, and that the latter carried a gun. It was shown that King was a small man, while the defendant was a large one. It was a little later than three o'clock when defendant and King left the church. The latter has never been seen since that time. Andy Hale heard four gunshots that afternoon—three of them a short time after the men had passed his place, and the fourth about a half hour later. The location of the person firing the fourth shot seemed from the report to be a mile or more distant in

the direction of Charley Poor's house, who was a brother of the defendant, and in which direction the two men were going when they passed Andy Hale's. The other shots were in the same general direction, but a little further north and west. Nora King, upon her return to her step-father's house a half an hour or less from the time the defendant and her husband left the church together, told the members of her family of the defendant's coming to the church and demanding that Cleve accompany him and of the latter's reluctant compliance. The unaccounted absence of King under the circumstances occasioned neighborhood comment, and on Monday evening the defendant and a fourteen-year-old son of his came to the house of Green Stacy. The latter's wife, who was the grandmother of Nora King, told defendant what Nora had said, and asked him if he knew where Cleve was. Defendant said he did not; that he had not seen him since the Saturday preceding at Mill Creek; that he (defendant) was not at the church on Sunday and if Nora said so she was "fibbing." Green Stacy, his wife, defendant and a fourteen-year-old son of the latter then went up the creek to Andy Hawkins's, where Nora King was then staying. What occurred upon their arrival we give in the language of the record, Nora King testifying:

After stating that the defendant came to the church building where she and her husband were and that defendant demanded that King accompany him and that they went away together, she was asked: "When did you next see Ed Poor, the defendant?" She answered: "On Monday night at Uncle Andy Hawkins's;" that he came there a little after dark with her grandmother and grandfather Stacy and defendant's boy. In reply to the inquiry as to what was said or done, she testified: "He (defendant) came in and sat down near the door; he appeared—his voice was very weak or something—he seemed like something was the matter with him. I did not know what was the matter. He came in and sat down close to the door, and then he got up and stepped to the door and said, 'Nora, I want to speak to you,' and we

stepped out on the porch and he says, 'I want you to deny my being at the head of Trace Creek.' I says, 'What for.' He says, 'What for? It will cause people to talk about us.' I says, 'Ed, I can't do it; I have told Mama and Papa and Sister Grace you were there.' And he says, 'If you have ever done anything in your life, do it for me now.' And I says, 'I can't do it.' Grandma called me then and says, 'Nora!' I then called him into the kitchen and I says, 'Ed, I want you to tell me where you left Cleve.' He says, 'He is over yonder.' That's what he first told me about him. I says, 'Is it possible you have killed him?' And he never said nothing. He never said he did nor he didn't.''

In answer to the inquiry as to what defendant said, if anything, with reference to it being somebody else at the church on Trace Creek on Sunday afternoon, she testified: ''Well, he says, 'You tell it was Ed Smith instead of Ed Poor.' I told him I couldn't do it.'' ''What was said, if anything, that you didn't tell?'' ''Well, I says, 'Ed, Ma thinks you have killed Cleve: she is going to have a crowd hunt for him tomorrow.' He says, 'They can hunt, but they will never find him. He is gone and he will never come back.' I asked him where he had left Cleve and he says, 'He is over yonder,' and that's the last talk I ever had with him.''

On Monday, October 27, 1919, at about midnight, the barn of Charley Poor, a brother of the defendant, was burned. On the Friday following, the sheriff of the county, with a number of others who had been searching for Cleve King, found among the ashes of the barn what was identified as the remains of a human being. The body had been reduced to ashes, except a part of the right hip and of the thigh. From the size of the bones and the length of the entire body, as outlined in the ashes before being disturbed, the remains indicated that they were those of a small man; an adult, say the experts. Remnants of clothing and what appeared to have been buttons, which crumbled upon being touched, and a metal belt buckle were found in the ashes with

the remains. This belt buckle was identified by a number of persons as having been similar in every respect to one worn by Cleve King the day of his disappearance.

A neighbor of defendant's named Berry, accompanied by a school teacher named Sample, went to defendant's house to confer with him in regard to a neighborhood school on the Sunday afternoon that Cleve King was last seen; they did not find the defendant at home, nor could they find him in the neighborhood, until about seven o'clock that evening when, upon their return, they found him at his home.

Testimony on behalf of the defendant as to his meeting Nora King and her parents in Fredericktown and as to what was said, differs in no material particular from the testimony in that regard for the State. Testifying in his own behalf, he details his whereabouts from that time until Monday evening, October 27th, when he admits he saw Nora King at Andy Hawkins's, but denies that he attempted to persuade her to contradict her former statement as to his coming to the church and leaving there with her husband; that on the contrary he remonstrated with her against the making of such a statement, because, he says, it was not true. He states that on Monday night he was at home sick, and about midnight saw a light in the direction of his brother's, Charley Poor's, which was afterwards found to have been the latter's burning barn; that he apprised his father and boys of the fire and they together looked at it for a time and then retired; that, in company with his two boys, he went to the scene of the fire Tuesday morning; that it was still burning and there was considerable heat, and he could not approach nearer than thirty feet; that he saw no remains of a human being and did not look for any. His fourteen-year-old boy and his father corroborated his statements as to his whereabouts during the afternoon of October 26th, stating that at that time he was at home.

He is shown by several witnesses to have sustained a good reputation in the neighborhood prior to this

charge; and he states that his relations with Cleve King were at all times friendly.

It was attempted to be shown that the shots heard by witnesses for the State were made by persons who stated that they had fired a gun two or three times that afternoon in the direction from which the reports came. The testimony of the defense in this behalf does not attempt to account for the last shot testified to by the State's witnesses. Testimony wholly irrelevant, in view of all the other facts in the case, was given as to certain threatening remarks which were stated to have been made by the wife of Cleve King in regard to him several months prior to his disappearance. In fact, the record is replete with irrelevant testimony.

The information was in three counts and charged murder in the first degree. At the close of all the testimony the State elected to stand on the third count, which, omitting the formal preliminary parts and the signature and affidavit of the prosecuting attorney, is as follows:

"For third count to this information, the said David M. Tesreau, Prosecuting Attorney within and for Madison County, in the State of Missouri upon his oath, further informs the court and present and charge that the defendant, Edward Poor, on the 26th day of October, 1919, at and in Madison County, in the State of Missouri, with force and arms, in and upon the said Cleveland King aforesaid, feloniously, willfully, deliberately, premeditatedly, on purpose and of his malice aforethought, did make an assault and the said Cleveland King, in some way and manner and by some means, instruments and weapons to your informant unknown, inflict upon the body, head, neck and limbs of the said Cleveland King, divers and sundry wounds and injuries, and did then and there feloniously, willfully, deliberately, premeditatedly, on purpose and of his malice aforethought deprive of life, so that said Cleveland King, then and there instantly died on the 26th day of October, 1919,

at and in the County of Madison and State of Missouri, and so the said David M. Tesreau, Prosecuting Attorney within and for Madison County, in the State of Missouri, aforesaid, upon his oath aforesaid, does say that the said Edward Poor, him the said Cleveland King, in the manner and by the means aforesaid, unknown, then and there feloniously, willfully, deliberately, premeditatedly, on purpose and of his malice aforethought did kill and murder against the peace and dignity of the State.''

I.  A piecemeal criticism of the information is made. Read as a whole it clearly and succinctly charges the crime of murder in the first degree. While not describing the weapon used to effect the death, it does, as is permissible, allege that the means employed by the defendant whereby he deprived the deceased of his life were unknown; in addition, it alleges that the homicidal act was done feloniously, and in this respect, as well as in others, it meets the objections that were made to a charge of murder in the first degree in the somewhat diffuse opinion of this court in State v. Woodward, 191 Mo. 617, and cases there discussed. Further than this, if a precedent were needed to sustain the correctness of our conclusion in regard to this information, it is, aside from names and dates, identical with the indictment approved by the Supreme Court of Massachusetts in the famous Parkman-Webster case (Comm. v. Webster, 5 Cush. 295, 52 Am. Dec. 711), in which the opinion, written by that able jurist, Chief Justice SHAW, discusses with much learning the sufficiency of the charge there made, in which the facts were, in leading particulars, not unlike those at bar. Likewise, in the well considered case of State v. Williams, 52 N. C. 446, 78 Am. Dec. 248, it is held that where the indictment charges that the murder was committed ''in some way and manner and by some means, instruments and weapons to the jury unknown,'' that it is sufficient. Like phraseology was employed and approved by the Supreme Court of North Carolina in an indictment charging murder in the first degree in State v. Parker, 65 N. C. 453.

*Information.*

This ruling was made although the evidence presented different ways and means by which the deceased might have been killed.

The objection to the sufficiency of the information on account of the prosecuting attorney's affidavit thereto, in that it is made according to his best "information and knowledge" instead of "information and belief," should, if it had possessed any merit, have been raised by a motion to quash. [State v. Green, 229 Mo. 642; State v. Montgomery, 181 Mo. 19.] However, there is no merit in the contention. Belief must be based upon knowledge, not positive, perhaps, but sufficient to create a mental conclusion. While the word "knowledge" is not synonymous with "belief," used in the general sense in which it was employed in the affidavit, it might be well understood to indicate that the information was filed with such knowledge as the prosecuting attorney then possessed, which amounted, in his mind, to a belief in the matter stated in the charge. In any event the precise statutory form of the affidavit is not mandatory and the use of the word "knowledge" instead of that of "belief" could not, under any reasonable theory, have been prejudicial to the defendant.

II. Defendant assigns error in the refusal of the trial court to sustain his challenge to a juror named Pridy on the latter's *voir dire* examination. Pridy, although not stricken from the array, was not

Juror.

chosen as one of the trial panel. Questioned by counsel for the defendant, he said that he had read an account of the matter in the county newspapers and had formed an opinion in regard thereto which it would require evidence to remove before he would believe that the defendant was innocent of the charge; that if selected on the trial panel he would hear all of the evidence and give the defendant a fair and impartial trial; "that his mind was not made up either way; that he could sit there and it would require the State to prove the case to his satisfaction beyond a reasonable doubt." The

contention of defendant is that the array required by the statute from which to select the trial panel should have been shown to have no opinion as to the case, whether removable by evidence or not.

We might well pass lightly over defendant's contention and sustain the trial court's ruling on the ground clearly announced in State v. Mace, 262 Mo. l. c. 154, and cases cited, that there was no such specific challenge to the juror for cause as is required by the statute. However, that the defendant may be denied no right he may be entitled to under the most liberal interpretation of the statute in his behalf, we have considered the contention in the light of the facts disclosed by the juror's examination.

The precise language of the statute is as follows: "It shall be a good cause of challenge to a juror that he has formed or delivered an opinion on the issue, or any material fact to be tried, but if it appears that such opinion is founded only on rumor and newspaper reports, and not such as to prejudice or bias the mind of the juror, he may be sworn." [Sec. 4014, R. S. 1919; formerly Sec. 5220, R. S. 1909.]

The limitations expressed in this statute are unequivocal. While it shall be a good cause for challenge that the juror has formed or delivered an opinion upon any issue or material fact to be tried, such opinion will not disqualify if founded only upon rumor or newspaper reports and is shown to be such as to not prejudice or bias the mind of the juror after having heard the evidence. A somewhat prolix examination of this juror simply elicited the fact that having read an account of the matter in the county papers he had formed an opinion in regard thereto but, despite this fact, if selected on the trial panel he would be governed by the evidence adduced at the trial in the making up and rendition of the verdict. Therefore, if it had been shown, as it was not, as we ruled in State v. Taylor, 134 Mo. l. c. 141 that *all* of the facts in regard to the matter at issue had been published and had been read by the juror, he would not

have been disqualified, in view of the answers given by him upon his examination. The test as to the qualification of a juror based upon the reading of newspaper reports is, as we held in State v. Brooks, 92 Mo. l. c. 575, whether or not, despite the opinion formed from reading such reports, the juror can render a fair and impartial verdict. If his examination discloses that he can, then this court will not interfere with the discretion exercised by the trial court in refusing to sustain a challenge to him. We said in the Brooks case, quoting from earlier rulings, that "the rule is well settled that it is the duty of the court to superintend the selection of the jury in order that it may be composed of fit persons. Large discretion must be confided to the trial court in the performance of this duty. Nor will the action of the court in this behalf be made the subject of review unless some violation of law is involved, or the exercise of a gross and injurious discretion is shown. . . . It is sufficient that the judge be satisfied, from his personal knowledge of the jurors; their answers to other questions; their reputation for integrity and intelligence; and his judgment in respect to such qualifications will not be reviewed. . . . As to whether an opinion formed by a juror is of such character as necessarily to raise the presumption of partiality, is to be tried, so far as the fact is concerned, upon the evidence; and the finding of the trial court on that issue ought not to be set aside by a reviewing court unless the error is manifest. No less stringent rules should be applied by the reviewing court than those which govern in the consideration of motions for new trials because the verdict is against the evidence. In such cases the manner of the juror while testifying is oftentimes more indicative of the character of the opinion than his words. That is seen below, but cannot be on the record."

The rule as above announced and the discretion of the trial court in the exercise of same, have received frequent subsequent approval by this court. [State v. Herring, 268 Mo. l. c. 529, 188 S. W. 172; State v. Schmul-

bach, 243 Mo. l. c. 538; State v. Rasco, 239 Mo. l. c. 557.]
We therefore hold this contention to be without merit.

III.   Instruction numbered 3 given by the court de-
fined murder in the first degree.   Error is assigned as to
the giving of this instruction.   Convicted of murder in
the second degree, the defendant will not be
Instructions.   heard to complain of alleged errors in an in-
struction for murder in the first degree.   [State v. Baugh,
217 S. W. l. c. 280 and cases; State v. Clinton, 278 Mo.
l. c. 347, 213 S. W. l. c. 842; State v. Lewis, 264 Mo. l. c.
430; State v. Wilson, 250 Mo. l. c. 329.]

Instruction numbered 9 asked by the defendant and
refused was clearly an improper comment on the evi-
dence and the trial court cannot be convicted of error in
refusing to give it. The difference in verbiage and mean-
ing between this instruction and that approved (No. 7) in
State v. Glahn, 97 Mo. l. c. 690, cited by appellant, is evi-
dent upon even a casual comparison. The latter is general
in its terms and authorizes a finding of not guilty "upon
a review and consideration of all of the evidence," while
the former attempts to segregate certain facts which
the jury are directed to take into consideration in their
review of the entire evidence; in other words, they are
instructed to review the entire evidence, subject to the
limitations prescribed in the instruction. This is unau-
thorized and cannot, as we have stated, be construed other
than as a comment on the evidence. [State v. Lewis,
264 Mo. l. c. 432; State v. Mitchell, 229 Mo. l. c. 697; State
v. Shelton, 223 Mo. l. c. 139.]

IV.   It is contended that there was an absence of
proof of the *corpus delicti*—that the remains were so
completely burned as to be impossible of identification.
This contention is based not so much upon the
Corpus
Delicti.   question of a lack of testimony as upon the na-
ture of same; the assumption being that there was
no such evidence adduced as to the death of King as is
required to constitute one of the component parts of
proof of the *corpus delicti*. In short, that the death of

King was not proved by direct and positive evidence. It is true that it was the rule at the common law, as well as in some other jurisdictions, with reference to proof of the *corpus delicti* in homicide cases, that the first component part of the crime, to-wit, the death of the person, must be established by direct evidence, while the criminal agency of the accused, or the second component part, might be shown by circumstances. [Reg. v. Hopkins, 8 Car. & P. 591; King v. Hindmarsh, 2 Leach C. L. 648; People v. Bennett, 49 N. Y. 137; Ruloff v. People, 18 N. Y. 179; State v. Flanagan, 26 W. Va. 116.] However, it has long been the rule in this jurisdiction that all of the elements of *corpus delicti*, including the fact of the death of the person alleged to have been murdered, as well as the criminal agency of the accused and the identity of the deceased, may be proved by circumstantial or presumptive evidence when direct proof is not obtainable. This court so held in State v. Dickson, 78 Mo. l. c. 446, where it is said, in effect, among other things, that it was not necessary upon questions of identity that witnesses swear pointedly; it is only necessary, and is of common occurrence, for them to swear that they believe the person to be the same, and the degree of credit to be given to their evidence is a question for the jury. Articles found upon the body are recognized in the Dickson case as constituting sources of proof of identification. In the Henderson case, 186 Mo. l. c. 493, we said that the two elements of *corpus delicti* in a murder case consist of the death of the person alleged to have been murdered and the criminal agency causing the death; that while both of these must be established to sustain a prosecution for murder, the fact of the death need not be established by direct and positive evidence, "but now by the weight of authority in this country the fact of the death as well as the criminal agency may be shown by circumstantial evidence when that is the best evidence obtainable, and provided always that it is sufficient to produce conviction in the minds of the jury beyond a reasonable doubt." The court concludes that to rule

otherwise would be to place a premium upon atrocity and enable a murderer to escape punishment for his crime by so mutilating or burning the body of his victim as to prevent its identification or recognition. . The grave importance of the application of the rule as announced in the Henderson case is exemplified by the facts, which were, briefly stated, as follows: An old negro man, Joe Buckner, lived alone in a little cottage a few miles from Wentzville in St. Charles County. He was last seen at about five o'clock p. m., April 12, 1903, when he left the house of one of his sons who lived in the neighborhood and started homewards. Late that night his cottage was discovered to be on fire. It was speedily consumed and the next morning the charred remains of a man were found in the ashes. With these remains was found the metal portion of a pocket knife of peculiar shape, such as the old man was known to have carried. From that day until the date of the trial he had not been seen. No motive was suggested why he should have burned his house or have fled the country. All of his children lived in the immediate neighborhood, and if the cottage had been destroyed by another in his absence the natural and logical sequence, says the court, would have been that he would have first discovered the fire and have given the alarm. This reasoning in support of the conclusion that the body found in the ruins was that of the old man, and correlative facts as to the prior relation existing between him and the defendant are adduced to connect the latter with the crime. These correlative facts consisted, among other things, of evidence of an altercation between the old man and the defendant which engendered bad blood between them, threats of the defendant against the old man, the procuring of ammunition for a gun by the defendant, and the indifference of the latter when notified of the fire while it was in progress and his refusal to go to the scene or to attempt to offer any relief. While it is true that there was in this case a subsequent confession by the defendant, this does not affect the force of the court's ruling as to the character

of the testimony admitted or the *quantum* of the proof necessary to establish the *corpus delicti*.

In State v. Barrington, 198 Mo. l. c. 113, the rule so clearly announced in the Henderson case is given emphatic approval. The similarity of the facts in this case to those at bar in that the defendant and the deceased left together and the latter was never seen alive thereafter, renders a brief statement of that case not in appropriate, as showing by analogy at least the probative force of the evidence here adduced. The defendant Barrington and one McCann left a hotel in the City of St. Louis kept by McCann, on the evening of June 18, 1903. The latter on his departure was in good health and spirits, and said to his wife that he would return in a short time. At about ten o'clock that night these parties were seen on a suburban car going towards Bonfils Station in St. Louis County. McCann was talkative and in a good humor and asked when the next car would return to the city, that he must get back on it. These parties alighted from the car at about 10:35 p. m. The last time that McCann was seen alive he and the defendant were walking along a pathway leading away from the car-track toward a quarry pond in the vicinity. A short time thereafter a pistol shot was heard, followed by an outcry, and another pistol shot, and then silence. Early the next morning the defendant was seen walking along the car-track towards the city, which was distant about twelve miles. He was thus walking, although it was shown that he had money on his person to pay carfare and did mount a car as soon as the corporate limits of the city were reached. While he was walking near the car line he was seen by different persons to turn about, evidently to prevent identification. Several days later articles of clothing were found concealed along the route that defendant had traveled on his return to the city. About a week later a naked human body was found in the quarry pond towards which defendant and McCann had gone the night of the latter's disappearance. The body was finally identified to be that of McCann.

There were other incriminatory facts not necessary to be repeated here. Enough has been stated to show that the introduction of circumstantial evidence was permitted not only to prove the death but the defendant's agency therein.

Supported, therefore, by the precedents which sanction the admission of circumstantial evidence in cases of this character, there can be no reasonable question as to the correctness of the rulings of the trial court in the admission of evidence of that character in the instant case. There remains, therefore, only the question as to the probative force of that evidence or the *quantum* of proof necessary to sustain a conviction.

It was long ago said by this court, in State v. Lamb, 28 Mo. l. c. 232, that "when the guilt or innocence of a prisoner is the subject of determination for a jury, they are the only competent judges of the sufficiency of the evidence to sustain a verdict." This rationally follows by reason of the jury's relation to the administration of justice. "Our system of jurisprudence," says Judge Scott, in the Lamb case, "contemplates that jurors are as much superior to the courts in the determining of matters of fact as the courts are superior to them in deciding questions of law." The line of demarcation thus defined between these two instrumentalities employed in the prosecution of criminals has been uniformly recognized throughout our entire judicial history; and it is only to be crossed, as we said in the recent case of State v. Underwood, 263 Mo. l. c. 685, "when there is a total failure of evidence or it is so weak as to justify the conclusion that the verdict was the result of passion or prejudice" (citing cases).

Briefly, but with that considerate care which should be given to a review of the testimony in a case involving the liberty or life of a defendant, what were the facts at bar? We enumerate them at the expense of repetition:

Animus amounting, without exaggeration of terms to animosity on the part of the defendant existed against

the deceased. Concrete support for this conclusion is found in the repeated statement of the defendant to different persons that the deceased must straighten up the tales he had been telling. That defendant persisted in this feeling, which must have grown more malicious with time, is evident from his coming to the church building on the Sunday following his last expression of animus against the deceased and while armed demanding that the latter accompany him, as he said, to straighten up the tales. The reluctance manifested by the deceased in accompanying the defendant could only have arisen from fear of the defendant, based evidently upon the latter's personal demeanor and his armed condition. Under these circumstances they left, and their leaving is corroborated by the testimony of Andy Hale. When they left his sight the deceased, so far as human testimony is concerned, passed beyond mortal ken. Soon thereafter, coming from the direction in which Hale had seen the men going, he heard in somewhat rapid succession three gunshots, and after an intermission, another. The three first shots were accounted for. The fourth was not. Some time during that Sunday afternoon a neighbor of the defendant and a country school teacher found it necessary to consult the defendant, who was one of the school directors, in regard to the employment of the teacher during the coming term. They went to his house and were informed by his father that he was not there. Their business evidently being urgent, they sought the defendant at different places in the neighborhood, but he was not to be found until about seven o'clock that evening, when, upon their return, they found him at home. The succeeding Monday night, being at the house of a man named Stacy, he was asked about Cleve King, and Mrs. Stacy repeated the statement that had been made to her by King's wife as to her husband leaving with the defendant the day before. He denied this *in toto,* and they went to where Nora King was staying, evidently for the purpose of enabling him to confront her. Instead of confronting her, we find him calling her

aside and pleading with her to deny her statements, and when asked by her where her husband was, he said in his agitation, pointing over towards Charley Poor's, that "he was over there." He made no response when she accused him of having killed her husband. Late that night Charley Poor's, his brother's, barn was found to be on fire and was entirely consumed. The human remains found in the ashes were in size and appearance corresponding to that of Cleve King when living. A belt buckle found with the remains was similar in every material particular to one worn by him on the day of his disappearance. It is rather significant that the defendant, although he states he was indisposed, as was the plea of the defendant in the Tettaton case, 159 Mo. 354, did not manifest more interest in the burning of his brother's barn in the immediate vicinity than, to simply note the fact of the fire and retire. Indifference of this character in the presence of events of unusual occurrence is not infrequent in criminal annals, especially in homicide cases. Space need not be taken up in recounting instances, and it is only necessary to say that they manifest a condition of the mind on the part of defendants not in accord with normal conditions. With this evidence before them, the jury, more keenly sensitive on account of their immediate knowledge of the facts, derived from the living witnesses, than one who must obtain his information in regard thereto from the cold record, found the defendant guilty. We have no means of knowing, nor do we understand, in the face of these facts, why the jury tempered their verdict by a finding of murder in the second degree. This, however, is authorized under our law (Secs. 3908, 3692, R. S. 1919), and there being substantial evidence to sustain their finding of guilty, we need not concern ourselves with the degree.

Other errors assigned were not properly preserved and hence have not been reviewed.

In view of all of which the judgment should be affirmed, and it is so ordered. All concur.