STATE of Missouri, Plaintiff-Respondent,

v.

Johnnie Lee BROOKS,
Defendant-Appellant.

No. 37190.

Missouri Court of Appeals,
St. Louis District,
Division Three.

Feb. 22, 1977.

Motion for Rehearing and for Transfer
Denied April 15, 1977.

Application to Transfer Denied June
14, 1977.

London & Greenberg, Norman S. London, C. John Pleban, St. Louis, for defendant-appellant.

John C. Danforth, Atty. Gen., Preston Dean, Paul Robert Otto, Asst. Attys. Gen., Jefferson City, Brendan Ryan, Circuit Atty., Henry Fredericks, Asst. Circuit Atty., St. Louis, for plaintiff-respondent.

SIMEONE, Chief Judge.

## I

### Introduction

This is an appeal [1] by the defendant-appellant, Johnnie Lee Brooks, from a judg-

ment of conviction entered by the circuit court of the City of St. Louis on June 12, 1975. The appellant was found guilty by the jury of the offense of robbery in the first degree, and the court, under the Second Offender Act, sentenced him to the department of corrections for a term of fifty-five years. Sections 560.120, 560.135, 556.280, RSMo. Defendant appeals. For reasons hereinafter stated, we affirm.

Defendant-appellant raises numerous points seeking either a reversal of the conviction and discharge, or, in the alternative, a reversal and remand for further proceedings. These proceedings arise out of the well-publicized events of September 23, 1971, during which a young woman, Miss Wilma Chestnut, allegedly lost her sight.

█ Appellant does not question the sufficiency of the evidence to make a submissible case of robbery. The evidence, however, is voluminous and often contradictory and inconsistent. But such inconsistencies are for the jury to resolve. *State v. Hodges*, 537 S.W.2d 886, 887 (Mo.App.1976); *State v. Berry*, 526 S.W.2d 92, 95 (Mo.App. 1975). Our function is only to determine whether prejudicial error was committed.

## II

### Overview of the Facts

A general statement of the facts will be reviewed here. Additional details will be stated in conjunction with the appropriate points raised by the appellant.

[1] This is the second appeal and the third jury trial involving this case. The appellant was indicted in 1971 for the offense of assault with intent to maim with malice and robbery in the first degree. In 1972 he was found guilty of those offenses. The court found defendant to be a second offender and sentenced him to fifty-five years on the assault charge and fifteen years on the robbery charge to run concurrently. The conviction was reversed by this court and the cause remanded for a new trial. *State v. Brooks*, 513 S.W.2d 168 (Mo.App. 1973). The defendant was then tried in November, 1974, but, at the conclusion of the State's case, a motion for mistrial was sustained because the State in its opening statement detailed the evidence of one of the witnesses who elected to exercise his Fifth Amendment rights. The appellant was again tried in April, 1975, before a jury upon the original indictment charging assault and robbery. It is this 1975 trial which is now appealed. In this proceeding, based on the original indictment charging assault and robbery, he was found guilty of robbery after the State entered a nolle prosequi as to the assault charge at the close of the case.

On the evening of September 22, 1971, Miss Wilma Chestnut, a young woman then seventeen years of age and who resided at 3806 Newstead Avenue in St. Louis, left her home to spend the night with her cousin, Mrs. Lillie Belle Harry, at her third floor apartment located at 5782 Kingsbury Avenue. She was to babysit for Mrs. Harry's small child the next day. Miss Chestnut took with her some clothes and a record player which she had purchased for $19.00 the previous June. She arrived at Mrs. Harry's home at about 11:30 p. m. Miss Chestnut spent the night at Mrs. Harry's apartment.

Early the next morning, September 23, at approximately 6:00 a. m., the defendant, Johnnie Lee Brooks, drove his "'62 blue cadillac" to the home of an acquaintance, Ronald Clower (sometimes known as "Ronnie"). Clower resided at 4104 Enright Avenue with his mother. Clower accompanied Brooks in the vehicle while the latter drove his cousin to the Chrysler Plant in Fenton. Sometime later, Clower and the defendant returned to St. Louis and met another acquaintance of Brooks—Earl Harper. Harper joined the two in the automobile. The three young men—Clower, Brooks and Harper—made a brief visit to the home of a friend who resided on Kossuth Avenue and then proceeded to Miss Chestnut's home on Newstead. Clower and Harper got out of the car, Clower knocked on the door and "I asked was Pat there." [2] The person who answered the door informed Clower that Miss Chestnut was not at home, but was "babysitting or something over on Kingsbury." Clower and Harper returned to the car and the three drove down "Newstead and maybe Taylor" and picked up "another fellow named Lewis." [3] "Lewis'" name in fact was Ernest Charles Craine. Clower had never met either Harper or Craine. Clower knew him as "Lewis" but found out later his name was Craine. Craine entered

Brooks' automobile and they all drove over to "Kingsbury" where Miss Chestnut was babysitting.

Meanwhile, Miss Chestnut awoke between 9:30 and 10:00 a. m. With her were Mrs. Harry's eight-month-old baby and a "little girl [two years old] from downstairs." Sometime during the morning Miss Chestnut went to the apartment next door where Betty Simmons resided to use the telephone. She remained there in the apartment about five minutes and returned to Mrs. Harry's apartment.

When the four young men arrived at the apartment on Kingsbury, according to the testimony of Clower, they went up to the apartment and "knocked on the door where Pat Chestnut was at." Only Clower was known to Wilma. When they knocked "Pat" said, "'Who is it.'" Clower said "'Ronnie.'" "She said wait a minute, let me put on or finish putting on my clothes." [4] After she did so, she opened the door and Clower, Brooks, Harper and "Lewis" (Craine) entered. Clower introduced Brooks to Miss Chestnut saying, "'Pat, this is Johnnie and Johnnie, this is Pat.'" And according to Clower, Brooks said "'I'm Johnnie Brooks.'" Harper and Craine introduced themselves as "Earl" and "Lewis" respectively. The four young men stayed for approximately fifteen minutes and then left.

At trial, Miss Chestnut's version of the meeting was similar to that of Clower. According to Miss Chestnut, "Ronald Clower, Johnnie, Earl and Lewis" came to the apartment about 11:15 a. m. She had just given the baby a bath and "was looking out the window." She saw a "car that looked familiar"—a "'62 or '63 blue Cadillac." She heard a knock on the door; at the time she was putting a dress on. When she heard the knock, she asked who it was, and

2. Ronald Clower knew Miss Chestnut as "Pat."

3. In the record he is sometimes referred to as "Louis."

4. On cross-examination Clower testified that "Pat" opened the door just a crack and he saw

her wearing a "housecoat." He did not know whether she had a slip on. Defense counsel cross-examined him with a deposition Clower gave in 1972 in which he stated, "'She had on a slip, gown, as if she was fixing to get in the bathtub or something . . .'"

"[a] voice said, 'It's Ronnie, is Pat here.'" After replying and finishing dressing, she opened the door. She saw "Ronnie" and three other young men. She knew "Ronnie" but was not acquainted with the others. When the young men entered, "Earl [Harper] told me his name and I don't remember how I was introduced to Ernest but I believe—to Lewis, but he told me his name" "And I don't remember how I was introduced to Brooks, to Johnnie, but Ronnie later on called him Johnnie so I took it from there." Miss Chestnut described the person introduced to her as Johnnie as having lambchop sideburns and a scar on his lip.[5]

When the four young men left the apartment, they drove to a bar and a short time later drove Clower back to his residence on Enright where he stayed. Brooks, Harper and Craine then drove away. It was about noon. Clower did not see them anymore that day.

Then, at approximately 12:30 p. m., Brooks, Craine and Harper returned to the Kingsbury apartment. Miss Chestnut let them in, they talked for a few minutes and then left again. A short time later, they again returned.

"When they came in this time we [Miss Chestnut and the three men] all set down again and Johnnie kept asking for water and we talked for a while . . . ." Johnnie made a comment to Miss Chestnut that "he had a hot box" and asked her to get him a glass[6] of water. She "got him about three or four." A few minutes later, Miss Chestnut suggested that they leave so she could rest. Then, according to Miss Chestnut, "Johnnie got up as if he was

about to walk past me and he put his hands on my neck and started choking me." At the time Miss Chestnut was seated on the end of the couch closest to the door. Harper was on a chair. ". . . Johnnie couldn't push me back while he was choking me so Earl put his hands on my face and pulled me back." Miss Chestnut lost consciousness. She did not remember anything after that "until I regained consciousness." When she regained consciousness she was on the couch and she was unable to see. She could not see out of either eye. She went to the bedroom, "fell across the bed" and pushed a table against the door. She broke a window with part of her arm. After she broke the window she remembered ". . . somebody asking me to open the door and I couldn't and the next thing I remember I was in the police car . . . [and] I went to Homer Phillips Hospital."

During this time, Betty Simmons, who lived in the next apartment, went to Mrs. Harry's apartment and heard a noise coming from the apartment "[l]ike a crying."[7] She heard the crying "maybe twenty minutes." She returned to her apartment and called the police.

Police officers Jerome Dampier and Oliver Ising responded to the call. When they arrived Betty Simmons told them what she heard. Officer Dampier knocked on the door. ". . . I could hear someone in there screaming and I could hear it, sounded like furniture being knocked around so they didn't open the door so me and my partner kicked the door open." When Officer Dampier opened the door he saw Miss Chestnut bleeding from both eyes. He also

5. On cross-examination, Miss Chestnut stated that Earl gave his last name when the men came to the apartment, but that "Lewis" and "Johnnie" did not give any last name. She testified also that she did not open the door a "crack" and that when she opened the door she was in a dress—a "knee length purple empire dress with babydoll sleeves." When the three men returned the second time she had put on "my pink housecoat." She also testified that Johnnie had "lambchop sideburns" and had a scar on his lip. Testimony indicated that Brooks did not have lambchop sideburns or a scar, but evidence indicated Craine had a scar.

6. The glass was "one of the big glasses that you get from Steak 'n Shake."

7. When Mrs. Harry's older children returned from school they could not get in the apartment so Mrs. Simmons went over and knocked on the door. Before this time, however, she did not hear "anything at all" either in the hallway or inside Mrs. Harry's apartment. She did not hear ". . . any young children screaming or crying or hollering . . . ."

saw some "broken glass" in the toilet bowl, ". . . like it may have been a jar, broken jar. . . ." However, he did not remove it and did not know what happened to it. The officers called for a cruiser which took Miss Chestnut to the hospital. Afterwards they returned to the apartment.

When Mrs. Harry returned to her apartment sometime "after three," the policemen and the children were there but Miss Chestnut had been taken to the hospital. "The apartment was all torn up. The furniture was out of place." The window was broken. The record player and her own tape deck and speakers were missing. She saw a part of the Steak 'n Shake glass in the toilet bowl. "Yes, there was glass in the toilet."[8] But she flushed the toilet.

Miss Chestnut's mother returned home from work about 3:00 p. m. and was taken to the hospital by officers. At the hospital Mrs. Chestnut conversed with her daughter. When asked various questions such as her name, her mother's name or who cut her, she responded "nobody" or " 'Ronnie.' " That was her answer to everything that I asked her."

That evening Mrs. Chestnut went to the apartment on Kingsbury. Miss Chestnut's record player was not there. It has never been recovered.

Approximately a week later, on September 29, 1971, Officers Warren Williams and Roger Kohler arrested the appellant in front of his home for his alleged participation in the robbery and assault.[9] Harper was also apprehended. After learning of the arrests, Craine went to California and it was not until June, 1974, that Craine was arrested.

On November 10, 1971, Brooks was indicted by the grand jury and charged with assault with intent to maim with malice (Count I), robbery in the first degree of the record player (Count II) and three prior convictions (Count III). Several witnesses were endorsed on the indictment including Dr. Reginald McKinney, Dr. Navin Amin, Earl Harper and Ernest Craine. The first trial was held in May, 1972, and resulted in a verdict of guilty of assault and robbery. The appellant was sentenced to a term of fifty-five years for the assault and fifteen years for robbery to run concurrently. Earl Harper was a witness during the 1972 trial. But the cause was reversed and remanded. *State v. Brooks, supra.* After reversal, a new trial was held in 1974 which ended in a mistrial at the conclusion of the State's case. Harper was not a witness in the 1974 trial because he exercised his Fifth Amendment rights.[10] Ernest Craine was a witness in the 1974 trial. Dr. McKinney was a witness in both the 1972 and 1974 trials, but one week before the trial of this cause, Dr. McKinney was deleted as an endorsed witness.[11]

---

8. On direct examination she testified that she did not look in the toilet bowl and did not take anything out of it. On redirect she testified that the Steak 'n Shake glass was "broken on the floor . . . [b]etween the bedroom and the front room." The prosecutor then confronted her with her testimony in the first trial in 1972. She then testified that part of the glass was in the toilet when she returned home.

9. The officers had been at appellant's home prior to the time of the arrest and were told by appellant's mother that Brooks was not at home. The officers returned to the station and later received a telephone call that appellant was at home. They returned and were told that appellant was at a store but would soon return. The officers saw the appellant on the sidewalk in front of his home and arrested him. He offered no resistance. He was advised of his rights, and told the officers that he had picked up Ronald Clower early in the morning and then picked up "Lewis" and that they went to Kingsbury, stayed about 15 or 20 minutes and left. Appellant stated that he "dropped" off Clower in the 4600 block on Enright and "that was the last time that he saw Clower or the last time he saw Wilma Chestnut . . ."

10. Harper was deleted as a witness prior to this trial.

11. Dr. McKinney examined Miss Chestnut upon her arrival at the hospital. He also assisted in the surgery performed on her eyes. His testimony in the 1972 and 1974 trials was to the effect that the incisions on her eyes were "deliberate in type and surgical in nature." This testimony conflicted somewhat with his grand jury testimony. The grand jury testimony was given to the defense prior to the 1974 trial. These facts will be further developed infra.

The trial from which this appeal is taken began on April 21, 1975. The appellant was tried upon the original indictment charging assault with intent to maim and robbery for his alleged participation in the events of September 23, 1971.

In the trial now on appeal, the hospital records of Miss Chestnut were admitted and Dr. Amin testified for the State. His testimony as well as Dr. McKinney's earlier testimony will be more fully developed. Suffice it to say here that Dr. Amin testified that he examined Miss Chestnut's eyes on September 24, 1971, the day after she underwent surgery by Dr. McKinney and Dr. Allman. Dr. Amin testified concerning Miss Chestnut's eyes that "[t]here was a laceration which means a cut involving the cornea in the right eye and the cornea involving the left eye and another laceration involving the right upper eyelid. . . ." Dr. Amin described the lacerations of the eyes, over objection, as "[s]traight and clean" and caused by either "two strokes or . . . two objects." Dr. Amin examined the eyes again in November, 1974, and testified that there was no vision—"[t]here is no hope."

Ernest Craine also was called as a witness for the State. But after testifying that he had pleaded guilty to the robbery of Miss Chestnut and was presently serving a sentence as a result of the plea, on advice of counsel, he invoked his Fifth Amendment privilege against self-incrimination and refused to testify further. At this point, the court excused Craine from testifying and permitted, over objection, Craine's transcribed testimony from the 1974 trial to be read to the jury. The pertinent parts of that testimony may be summarized here. Craine's transcribed testimony indicated that he, Harper and Brooks went to the apartment on Kingsbury with the intention "to get the record player and stuff." Craine did not go to the apartment on the morning of September 23, 1971, but only in the afternoon. Craine told Miss Chestnut, whom he had not met previously, that his name was "Louis" so she wouldn't know

what his real name was. The three talked with Miss Chestnut for awhile and then Brooks and Harper left to go to a liquor store. Craine waited for awhile and then left. On the way out he met Brooks and Harper who were returning from the store and the three went back into the apartment. Craine had to use the bathroom; when he came out, ". . . Brooks was choking her and Earl was—I don't know whether he had his hand over her mouth or what, but he was holding her arm and she passed out." At the direction of Brooks, Craine and Harper took the record player and some speakers, left the apartment and waited in the car for Brooks. Brooks returned five to ten minutes later. When he returned to the car, Craine stated that "Brooks said that he had cut her eyes out to keep her from identifying him." Brooks, Craine and Harper then went to some house where they sold the record player.

The defendant's evidence consisted of Officer Ising and certain neighbors of Brooks who knew him and his family. Mrs. Mattie Gregory testified that appellant looked the same in 1971 as he did at this trial. Officer Ising testified that when he entered the apartment Miss Chestnut was facing the window which was broken out; ". . . her hands were on the ledge and in a slump position." There was blood on the floor "[n]ear the window." He also testified that Mrs. Harry told him at the hospital that Miss Chestnut said that Ronald was in the apartment and they were talking and the doorbell rang, she opened the door and that was all she could remember.

Officer David Watson was the last witness. He interviewed Ronald Clower on September 24, 1971, and Clower stated that he saw Miss Chestnut "standing on a corner on the morning of September the 23rd, 1971." He also testified that Clower told him that he had learned of Miss Chestnut's injuries the next day, September 24.

At the close of all the evidence, defendant moved for a judgment of acquittal which was overruled. The next day, after

the motion for judgment was overruled and out of the presence of the jury, the State indicated to the court that it would file its memorandum of nolle prosequi as to the assault count, Count I.[12] The court gave defense counsel an opportunity to respond and counsel stated that he had none at that point. The memorandum was then filed and the court indicated that the State had entered its nolle prosequi as to Count I. Defense counsel then moved for a mistrial as to the robbery count (Count II) on the grounds ". . . that the jury has been prejudiced by hearing evidence that related to Count I which has now been nolle prosequed by the State, that evidence being the injury to the eyes of this individual, the most prejudicial and damaging evidence of the entire trial . . . .. To allow this jury to have heard the testimony concerning the assault to the eyes of the victim or the damage to the eyes of the victim when that is not necessary to the offense of robbery as contained in Count I, I contend is prejudicial and on that basis move for a mistrial, Your Honor."

The court overruled the motion for mistrial and overruled the motions for judgment of acquittal at the close of the State's case and at the close of the entire case. The cause was submitted to the jury on the robbery count. Before reading the instructions, the court informed the jury that ". . . this case will be submitted to you only on the charge against the defendant of Robbery in the First Degree." The instructions were read, arguments were made, the jury retired and after deliberation the jury returned a verdict of guilty of the offense of robbery in the first degree.

Thereafter the court set a date for the assessment of punishment. Prior to the date for the assessment, the State and the defendant filed legal memoranda concerning the effect of *North Carolina v. Pearce,* 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969) on the assessment of punishment the court might make. The court assessed punishment at fifty-five years for the offense of robbery in the first degree and filed a memorandum opinion. On June 3, 1975, appellant filed his motion for new trial and on June 12, the motion was heard and argued. The court overruled the motion for new trial, but in doing so expressed "some concern on the way the evidence came in." The court then granted allocution and sentenced the appellant to fifty-five years. Defendant appealed.

## III

### The Contentions on Appeal

On this appeal appellant urges four points for reversal or reversal and remand. First, he contends that the court erred in failing to declare a mistrial as to Count II, the robbery count, because of the admission of improper, irrelevant and highly inflammatory evidence after the State entered its nolle prosequi as to the assault count, Count I. Second, he contends the court erred in allowing Craine to invoke the Fifth Amendment and in admitting into evidence the transcribed prior recorded testimony of the 1974 trial because there was no showing (a) that Craine was now unavailable, (b) that the defendant was present at the time of

12. The memorandum stated that:

". . .

"WHEREAS, the defendant herein is charged by one indictment in two counts, to wit, Count I, Assault to Maim with Malice Aforethought, and Count II, Robbery First Degree, both offenses arising out of the above transaction, pursuant to the law as declared in *Ashe vs. Swenson,* 397 U.S. 436, 25 L.Ed.2d 469, 90 S.Ct. 1189 [1970], and,

"WHEREAS, the *Supreme Court of Missouri,* En Banc, on September 9, 1974, in *State vs. Neal,* 514 S.W.2d 544 [Mo. banc 1974], declared the law in Missouri that an assault which is the violence necessary for a robbery in one count cannot be the same assault against the same person in a separate count charging an assault, and,

"WHEREAS, the evidence adduced in the trial of this cause during the week of April 21, 1975, showed but one continuing assault on Wilma Chestnut which is the same assault charged in Count I and Count II herein,

"NOW, THEREFORE, the State of Missouri elects to proceed in Count II herein, Robbery First Degree, the charge encompassing the entire transaction; and further enters this memorandum of nolle prosequi as to Count I herein, *Assault to Maim with Malice Aforethought.*"

the taking of the 1974 testimony, or (c) that the defendant was afforded his right to fully cross-examine the witness during the taking of the former testimony. Third, he contends the court erred in overruling ". . . defendant's motion for judgment of acquittal at the close of the State's case and at the close of the entire case filed in both the 1972 trial and 1974 trial" because (a) "[t]he presentation of the testimony of Dr. McKinney in 1972 by the prosecution with full knowledge that he had given prior inconsistent sworn testimony [before the grand jury] and the failure to furnish said information to the defendant constituted a violation of the principles of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and due process of law" and (b) "[t]he conflicting testimony of Dr. McKinney negates the establishment of a corpus delicti as to the blinding assault charge."[13] Lastly, appellant makes the point that the trial court erred in assessing punishment at fifty-five years because the defendant had previously been sentenced on the robbery count to a sentence of fifteen years in 1972, ". . . and any increase in defendant's sentence heretofore imposed is violative of due process of law in that the said increase penalized defendant for successfully appealing his 1972 conviction."

### IV

#### The Mistrial Issue

As to his first point, his argument is to the effect that the procedure followed by the State in proceeding to trial on both assault and robbery and then dismissing the assault charge was designed to present improper, prejudicial and inflammatory evidence of the assault "under the guise" of presenting evidence relative to the assault count (Count I) ". . . when the prosecution well knew that Count I could not be sustained and had, in fact, planned to dismiss Count I after presenting the aforesaid

improper evidence and exhibits to the Jury." Appellant attempts to substantiate this conclusion by arguing that after all the evidence was introduced then for the first time the State contended that the assault was the same assault necessary to show the violence for robbery, and, relying on *State v. Neal,* supra, dismissed the assault count, whereas the evidence showed that the assault was completely separate and distinct from the robbery. The violence necessary to sustain the robbery was complete, appellant argues, when the choking of Miss Chestnut and the taking of the record player and speakers occurred so that when the assault took place thereafter there was a separate and distinct offense. Being such, the evidence relative to the assault was inadmissible.

Appellant argues that "in advance of the trial" the State knew it could not prove the essential elements necessary to convict defendant of the assault, but, despite this, presented evidence of the assault to the jury and engaged in a ". . . pre-trial plan to accomplish this end . . . ." That "pre-trial plan" was a nolle prosequi of Count I which would be presented at the conclusion of the evidence after the jury had been improperly presented with the details of the assault. Appellant argues, in effect, that the evidence of the assault was deliberately introduced when the State knew at the beginning of the trial that without the testimony of Dr. McKinney, who had been deleted as a witness, no corpus delicti of the assault could be established, knew that the possibility existed that Craine would invoke his privilege and was aware that *State v. Neal,* supra, had no application to the facts of the case. Appellant further contends that, since the State had cited *Neal* earlier in the trial, the representation made to the court during the argument of the motion for new trial that it had not applied *State v. Neal* to the instant case until an hour before filing the memo-

---

**13.** This point is difficult to determine. The appellant apparently contends that if the court in the 1972 and 1974 trials had sustained the motions for judgment of acquittal because the State had not provided the defense with the

grand jury testimony of Dr. McKinney prior to the 1972 trial then the appellant could not have been tried in the 1975 trial for the assault and robbery.

randum of nolle prosequi ". . . is nothing more than a completely false statement which was designed to mislead and did mislead the Court . . . resulting in an erroneous ruling and prejudice to this defendant. . . . " [14]

Summarizing his first point, appellant argues:

". . . the blinding assault as alleged in Count I . . . is a separate crime [15] which occurred subsequent to the completion of the robbery. The force or violence necessary for the robbery count is the act of choking and nothing more. The State, realizing that it had no evidence to sustain a conviction under Count I, developed well in advance of trial a plan to present improper, prejudicial and inflammatory evidence to the jury knowing full well that Count I would be dismissed after the presentation of the said improper evidence and exhibits. In an effort to carry out this plan, the State intentionally misled the jury as well as the Court, the defendant and his attorneys and made materially false statements to the Court and defendant's attorneys. As a consequence, the Court, because it was misled by the State, was caused to commit and did commit error in failing to declare a mistrial as to Count II [robbery] after the State entered a nolle prosequi as to Count I. As a further consequence the defendant was extremely prejudiced by such improper and inflammatory evidence [16] as brought forth through the scheme of the State." [17]

---

14. In the argument on the motion for new trial, discussion was had concerning the dismissal of the assault count at the end of the case. The court asked the prosecutor, as an officer of the court, what the factors were "that led up to the dismissal and what were the facts that led up to the dismissal." The prosecutor replied and the following occurred:

"[Prosecutor]: There was no discussion by myself or anyone to my knowledge in the Circuit Attorney's Office that this matter, that is the one count being dismissed, at any time prior to the time that we filed the memorandum of dismissal. The case of *State vs. Neal* was then reviewed with Mr. Ryan [the circuit attorney] and myself and it was Mr. Ryan's statement that under the law we had no alternative but to dismiss it or in the alternative leave it to the Court to dismiss it under the Neal decision. That was the first time it was ever discussed, that was the first time that I or Mr. Ryan, to my knowledge, or anyone in the Circuit Attorney's Office to my knowledge ever reviewed the Neal case pertaining to the Brooks case. And, in view of the fact that I related to Mr. Ryan that we had admitted into evidence or offered into evidence and it was admitted that Wilma Chestnut was in fact robbed and property was taken from her, we did not want to run the risk of . . . having the wrong count dismissed. . . . It was then and then for the first time that Mr. Ryan made the decision to dismiss the assault charge and leave the robbery charge stand rather than have the Court make that decision. . . . We did not want the robbery charge count dismissed by the Court for we thought if that were done and in view of the fact that there was evidence in the record that property was taken and converted to the use of the defendant, that that would be error. So, we then made the decision to dismiss the count pertaining to the assault and proceed on the robbery."

\* \* \* \* \* \*

[Prosecutor]: What I'm saying is that at the time we had this discussion one of the other Assistant Circuit Attorneys brought the mention of the case of *State vs. Neal.* We then re-read it. I read it once before. I had not ever applied Neal to this particular case. It was [an assistant circuit attorney] who brought the case to our attention and we re-read that one paragraph which I think is on page 3 of the Neal case, and we then at that time in the presence of . . . Ryan inter-changed the factual situation in the Neal case with the factual situation of the Brooks case.

THE COURT: When was that with reference to the first day of voir dire in this trial?

[Prosecutor]: This was immediately in the matter of an hour or so before the memorandum of dismissal was filed with the Court.

\* \* \* \* \* \*

15. And presumably evidence of a separate crime violates the principle proscribing the introduction of evidence of other offenses. *State v. Jackson,* 519 S.W.2d 551, 558 (Mo.App. 1975).

16. Presumably the testimony of Dr. Amin, the testimony of Miss Chestnut that she could not see after she regained consciousness, the hospital records, and the transcript testimony of Craine that Brooks said he had injured her eyes.

17. There were many typographical errors in this summary, but we shall disregard them.

Thus, the whole thrust of the appellant's position on this point in a nutshell, as we perceive it, is that the State, knowing that the assault charge could not be proved, developed a pre-trial plan to introduce evidence relating to the assault and blinding of Miss Chestnut and then at the end of the trial to dismiss that charge and proceed on the robbery charge only. And, since the evidence showed that the assault took place after the choking and the taking of the personal property, the robbery was complete so that evidence relating to the assault was not admissible.

The defendant's contentions are serious indeed and we treat them as such. But, after a careful reading of the entire transcript, we are convinced that appellant's contentions and arguments on this point are insufficient and are without merit.

■ First, the State proceeded on the original indictment filed in 1971 which charged both assault and robbery. That was the same indictment which formed the bases of the 1972 and 1974 trials. In this trial the State proceeded to prove the assault charge by introducing the hospital reports of Miss Chestnut and the testimony of Dr. Amin. Miss Chestnut also testified that the young men were in the apartment, she was choked by Brooks and when she regained consciousness she could not see. The thrust of all this testimony was that an assault took place in the apartment. By showing this evidence we believe that the corpus delicti [18] of the assault was established permitting the introduction of the inculpatory statement concerning the appellant contained in the transcript testimony.

It was only after all this evidence was introduced that the State dismissed the assault count. The State, considering the possible effects of *State v. Neal,* supra, on whether the defendant could be convicted of both assault and robbery, chose to dismiss the assault count.

In *State v. Neal,* supra, the Supreme Court held that where a robbery was the result of an assault committed upon an employee of a hardware store it was error to submit the assault charge.

". . . To thus split the single crime of robbery and prosecute it in Count I and a second time in Count III as an assault violated the rule against double jeopardy." *State v. Neal,* supra, 514 S.W.2d at 548.

The evidence in this trial indicated that there was a choking, an asportation of the record player and speakers, Craine and Harper left the apartment, Brooks remained behind and then some minutes later returned to the vehicle and made the statement to Craine. The State could well have been under the impression that the totality of the events constituted a continuous transaction so that if it had proceeded on both the assault count and robbery count—the assault being enmeshed in the taking—it may well have jeopardized an affirmance of a conviction on appeal.[19]

■ Neither do we believe that there was error in deleting Dr. McKinney as a witness although he testified in the 1972 and 1974 trials. The State is not obliged to call each and every witness who might be able to provide testimony. *State v. Napolis,*

---

18. The corpus delicti can seldom be proved by direct and positive evidence. In proving the corpus delicti the reasonable rule has always been that only the best proof that is presently attainable need be shown. *State v. Simler,* 350 Mo. 646, 167 S.W.2d 376, 383 (Mo.1943); *State v. Henderson,* 186 Mo. 473, 85 S.W. 576, 578–579 (1905); *State v. Poor,* 286 Mo. 644, 228 S.W. 810, 815 (1921). The corpus delicti may be shown by circumstantial evidence. See cases collected in 30 Am.Jur.2d, Evidence § 1141, pp. 316–317 (1967); *State v. Smith,* 329 Mo. 272, 44 S.W.2d 45, 48 (Mo.1931) and cases cited therein—corpus delicti may be proved by circumstantial evidence. In Missouri, the cor-

pus delicti has never been construed to require more than proof, direct or circumstantial, that a specific injury occurred and criminal agency of another. See *State v. Joy,* 315 Mo. 7, 285 S.W. 489, 494 (1926) (Blair, concurring); *State v. Hawkins,* 165 S.W.2d 644, 646 (Mo.1942).

19. *State v. Collett,* 526 S.W.2d 920 (Mo.App. 1975) decided in August, 1975, was not available to the State at the time of trial in April, 1975. There we held that where the assault takes place after the robbery has been completed there was no violation of *State v. Neal,* supra.

436 S.W.2d 645, 649–650 (Mo.1969). The failure to call Dr. McKinney as a witness does not, in and of itself, show a pre-conceived plan to introduce evidence of the assault and then dismiss the assault count. This will be further discussed under Point III.

 Second and more important, the introduction of the evidence of the assault—the medical records, Dr. Amin's testimony, Miss Chestnut's testimony and the transcript testimony of Craine—did not violate the principle proscribing the introduction of evidence of a separate and independent crime on the charge of robbery.[20] There was substantial evidence that a robbery had occurred. There was violence to the person of Miss Chestnut and personal property was taken. The issue then becomes whether evidence of the assault,[21] even under appellant's theory that there were two distinct and separate offenses, was admissible. Even under appellant's theory, the general principle which has always been adhered to is that acts, conduct and declarations of a defendant occurring after the commission of an offense (here robbery) which are relevant to show a consciousness of guilt or a desire or disposition to conceal the offense are admissible. 22A C.J.S. Criminal Law § 623b, pp. 456–459 (1961); *State v. Walker*, 357 Mo. 394, 208 S.W.2d 233, 236 (1948) and cases cited therein; *State v. Ruckman*, 222 S.W.2d 74, 75 (Mo.1949); *State v. Hudson*, 521 S.W.2d 43, 46 (Mo.App.1975); *People v. Spaulding*, 309 Ill. 292, 141 N.E. 196 (1923)—killing eye witness. This principle has been held applicable in situations where the State has charged different offenses and then dismissed one or more of them before submission of the case. *United States v. O'Brien*, 441 F.2d 260 (5th Cir. 1971); *Commonwealth v. Boden*, 399 Pa. 298, 159 A.2d 894, 900, 88 A.L.R.2d 223 (1960), *cert. denied*, 364 U.S. 846, 81 S.Ct. 89, 5 L.Ed.2d 70.

We hold therefore that evidence of the assault was admissible to show a consciousness of guilt or a desire to conceal the crime of robbery and prevent identification. Such evidence would have been admissible even though the appellant was charged with robbery only, and it is therefore not material that he was charged with assault and robbery and the assault count was later dismissed.

 Third, we cannot conclude that the trial court was misled or erred in not granting appellant's motion for a mistrial at the conclusion of all the evidence and after the State had entered its nolle prosequi as to the assault charge. It is well established that the prosecutor has the sole and exclusive discretion concerning whether or not to enter a nolle prosequi. *State v. Smith*, 363 Mo. 1235, 258 S.W.2d 590, 593–594 (banc 1953). The prosecutor even has the discretion to dismiss at the close of the evidence. *State v. Turner*, 458 S.W.2d 280, 281–282 (Mo.1970). At the time of the motion for mistrial, the trial court was confronted with the issue whether to declare a mistrial on the ground that evidence of the assault had been presented to the jury. We cannot conclude that the trial court erred in overruling the motion. The evidence of the assault was admissible on one or more theories. The granting of a mistrial lies within the sound discretion of the trial court. It is a drastic remedy and is to be exercised only in extraordinary circumstances where the prejudicial effect can be removed in no other way. *State v. Holland*, 534 S.W.2d 258, 264 (Mo.App.1975).

 Fourth, appellant contends that the State was aware of *State v. Neal*, *supra*,

---

**20.** The well-established principle is that proof of the commission of separate offenses is not admissible unless such proof has some legitimate tendency to establish directly the defendant's guilt of the charge for which he is on trial. Evidence of other crimes when not related to the cause on trial violates the defendant's right to be tried for the offense for which he is charged. *State v. Taylor*, 508 S.W.2d 506, 510 (Mo.App.1974).

**21.** The hospital records, Dr. Amin's testimony that he observed that her eyes were, in his opinion, in the same condition after surgery as they were before and Craine's transcript testimony that Brooks had injured her eyes to prevent identification.

prior to the time of the dismissal of the assault count. Appellant argues that the statement of the State that it had not applied *Neal* to this proceeding until an hour before filing the memorandum of dismissal was "nothing more than a completely false statement" designed to mislead the court. It is true that the State was aware of *Neal* earlier in the trial for the decision was discussed in connection with whether Craine could invoke his privilege against self-incrimination. But on the argument on the motion for new trial it was made apparent that, although the State was aware of the decision, it had not fully considered the application of the specific principles of *Neal* to the factual situation regarding the events for which appellant was charged.

We conclude, therefore, that the totality of the record does not substantiate the contentions of the appellant in this first point. We rule this point against appellant.

### V

#### *Craine's Transcript Testimony*

As to appellant's second point, he argues that, when the court admitted the 1974 transcript testimony of Ernest Craine, he was denied his right of confrontation under the Sixth Amendment applicable to the State,[22] and, since there was no showing that Craine was presently unavailable and had no basis to assert his privilege, the court erred in admitting Craine's 1974 transcript testimony. Further, appellant argues that he was not afforded his right to cross-examine Craine fully because, having received a twelve-year sentence and having a "hope" that he would receive some consideration by the State, the incentive to give

testimony no longer existed. He contends that Craine is in a position similar to that of Harper in the 1972 trial which was reversed. *State v. Brooks,* supra. The considerations given Harper were not disclosed to the jury and here the considerations, if any, given by the State to Craine were also not disclosed so that the transcript testimony should not have been admitted.[23]

The thrust, therefore, of appellant's second point, as we perceive it, is that the court erred in allowing Mr. Craine to exercise his Fifth Amendment privilege and in admitting his 1974 transcript testimony because Craine was not unavailable and because appellant was not afforded his right to cross-examine Craine fully as to whether he received or hoped to receive any consideration for his testimony thus denying him his right of confrontation.[24]

During this 1975 trial, the State, having previously endorsed Craine, intended to call him as a witness. Craine [Lewis] had testified in the 1974 trial, although he did not testify in the 1972 trial because he had gone to California and changed his name. Craine was charged with robbery in connection with the events of September, 1971, and was tried for that offense in January, 1975. Before the conclusion of the case, he pleaded guilty and was sentenced to twelve years. Prior to calling Craine as a State's witness in this proceeding, extensive in-chambers discussions were held and Craine was questioned by both counsel and the court. The court appointed the public defender to represent him; the public defender had represented Craine in the charge of robbery growing out of the events of September, 1971. After consulting with his

---

**22.** He relies on *Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965); Article I, sec. 18(a), Mo. Const.; *Barber v. Page,* 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968) and *State v. Brooks,* supra.

**23.** Appellant argues that the alleged error was compounded because the court failed to instruct the jury that Craine had admitted he expected leniency and the failure to so instruct had the effect of depriving the jury of all the facts necessary to assess Craine's credibility. No such instruction was requested. This part

of the "argument" [no "point" was made] is not preserved for review.

**24.** He also contends that he was not afforded the opportunity to voir dire Craine in the 1974 proceeding. But appellant did not inform the 1974 court of the reason for his request to ask Craine questions before his testimony, nor did he object to Craine's testimony in the 1974 proceeding on the ground that voir dire had been refused. This contention is therefore without merit in this proceeding.

client, the public defender, in chambers, informed the court that Mr. Craine indicated that he elected not to testify

"[o]n the grounds that he has not been charged with any type of assault in connection with this case, merely the robbery, and because of the possibility of being charged in some connection with that assault on Wilma Chestnut, he feels he has been or might incriminate himself in some way by testifying and he will invoke the Fifth Amendment."

The court indicated that Craine would be called. ". . . He can invoke the privilege, if he wants to, and I'll make the determination and it will be done before the jury." The State argued that if Craine invokes his privilege, then it would offer the testimony he gave in the 1974 trial because he was fully examined and cross-examined. The State also would request to read the transcript of Craine's testimony in the 1974 trial. This was objected to by defense counsel because

". . . the cross-examination of the witness today would involve matters which could not have been gone into in November of 1974, such as whether or not any understandings that were made with the witness were in fact made and if so were any understandings with the State of Missouri lived up to when they disposed of his case that was pending against him. Also, whether or not there are any other convictions against this . . . witness."

Defense counsel contended that by not being able to cross-examine Craine he would not be given the "opportunity to establish what understandings there were" between Craine and the State which contributed to his testimony in the 1974 trial.[25] In chambers, counsel for Craine was examined. Counsel stated that he never had any conversation with the prosecutor about giving consideration to Craine in return for his testimony, he never told Craine that he

would be given any consideration if he would testify in the 1974 trial, and at no time did the State ever make any recommendation to the court in exchange for a plea of guilty. At no time did the State offer or suggest any consideration to Craine in exchange for his testimony in the November 1974 trial. At the time of Craine's plea, the State did not make any recommendation before the court sentenced him to twelve years. But Craine's counsel did admit that it was his intention to discuss leniency in return for his cooperation with the State but had had *no preliminary talks.* He did testify that at no time did any agent of the State indicate that there would be consideration for Craine.

In chambers, the transcript of Craine's trial was read. The transcript revealed that Craine had not discussed with anyone from the circuit attorney's office what consideration would be shown him and that Craine did not expect any consideration.

Craine was brought in chambers and questioned by the court and both counsel and invoked his Fifth Amendment rights. During interrogation by defense counsel, Craine was asked, "Had you, sir, been led to believe that in return for your testimony you would be shown any consideration or leniency, sir?" Craine replied, "No." And he replied in the negative when asked, "Were you in fact, sir, shown any leniency or consideration in return for your testimony, sir?" But Craine did think there would be some possibility being shown consideration. And when asked, ". . . Because, sir, you believed that you would receive some consideration, did you go ahead and testify in 1974 rather than taking the Fifth Amendment as you have indicated you are going to do here today," he replied "Yes." When again questioned by the prosecutor, Craine stated that he did not expect any consideration for testifying in the 1974 trial. Craine stated that after the State

25. ". . . What we are doing, Your Honor, is putting this witness [Craine] now, . . . *in the same position now as the witness Earl Harper was at the first trial which resulted in the reversal by the Court of Appeals of the first*

conviction because Earl Harper testified at the first trial without the defense having the benefit of knowledge of any arrangements between Earl Harper and the State of Missouri. . . "

concluded its case against him, he wanted the trial halted and wanted to plead guilty. He did plead guilty before the circuit judge and was sentenced to twelve years. Although he had "hopes for something," the transcript shows that this hope was a subjective one.

After these lengthy in-chambers discussions, the court indicated how it would proceed.

". . . Mr. Craine will be called. . . . He will be called as a State's witness and [the prosecutor] will begin his examination. . . . If he invokes the Fifth Amendment, at the moment I believe that the questioning should not continue, I am going to excuse Mr. Craine and tell the jury this: Mr. Craine has invoked his constitutional right not to testify on the grounds that his testimony in this cause may tend to incriminate him. The direct testimony of Mr. Craine and his testimony on cross-examination under oath at a prior trial of this cause which resulted in a mistrial and in which no conclusions were reached, will now be read to you.

Now, as I understand it, Mr. Craine has invoked his privilege with reference to the possibility of the assault charge being placed against him. *I believe that there is that possibility if he would testify in this cause and therefore I would uphold the privilege if he does invoke it in the courtroom* and I am putting it on the record here how. . . ." (Emphasis added)

After further discussion concerning which parts of Craine's 1974 testimony would be read to the jury, the jury was returned, and, in the presence of the jury, Mr. Craine was called as a witness for the State. He was questioned by the prosecutor. He gave his name, age, admitted he pleaded guilty in January, 1975, "arising out of a robbery of Wilma Chestnut," admitted he received a sentence of twelve years and, when asked whether he was acquainted with Brooks, he refused to answer and invoked his privilege. After the court determined that he would refuse to answer

any further questions with reference to the case, he was excused. Defense counsel complained that he was denied the right to cross-examine Craine concerning his conviction for robbery. The court thereupon inquired of Craine whether he would refuse to answer all the questions asked either by the prosecutor or defense counsel. And after indicating he would, the court excused him and informed the jury that Craine's 1974 testimony would be read to them by counsel.

The 1974 transcript testimony, both direct and cross-examination, was then read to the jury. The transcript testimony of the 1974 trial revealed that Craine was acquainted with Brooks, that Brooks was with Harper but that he did not know Ronnie Clower. Craine testified that he, Brooks and Harper went to the Kingsbury house where Miss Chestnut was present. She was in a housecoat and they stayed 15–20 minutes. He introduced himself to Miss Chestnut as "Louis" and believed that Brooks introduced himself as Johnnie. After a while Harper and Brooks left and Craine stayed for about 15 minutes; when they didn't come back, he "got up and left." But he later came back with "Earl and Brooks." The three returned to the apartment and Craine went to the bathroom. When he came out of the bathroom, ". . . Brooks was choking her and Earl was—I don't know whether he had his hand over her mouth or what, but he was holding her arm and she passed out." At that Craine pulled Brooks "off her." "[Brooks] told us to get the record player and go on downstairs in the car. We got it and went downstairs in the car." Harper picked up the record player and Craine picked up the speakers. Brooks was still in the apartment when Craine and Harper left. About five or ten minutes later Brooks came to the car and said ". . . he had cut her eyes out to keep her from identifying him." They went to a house later and sold the record player. Brooks offered him five or six dollars. Craine left Brooks and Harper and went to a friend's home on the north side of town. In the course of the testimony, he admitted he was charged with robbery and

the charge was still pending. Later, Craine left for Los Angeles and changed his name to Speaks to avoid apprehension. But in June, 1974, he was apprehended and returned to St. Louis.

The cross-examination of the 1974 testimony was then read by defense counsel. The cross-examination brought out that the robbery charge was pending and that he robbed Miss Chestnut of the "items." On cross-examination it was revealed he had a scar on his lip and was known sometimes as "Scarhead."[26] He admitted that he introduced himself to Miss Chestnut as "Louis." But he denied going to Miss Chestnut's in the morning of September 23, 1971, with Brooks, Harper and Clower. He only went there in the afternoon. Testimony brought out that he had long sideburns. He admitted that he had prior convictions for forgery and burglary in Texas. He admitted having an attorney for the robbery charge pending against him and stated that he had not discussed with anyone from the Circuit Attorney's office what consideration would be shown to him, if any, and in fact stated that he did not expect any consideration.

The redirect testimony from the 1974 transcript was also read to the jury. That testimony indicated that while he understood that his case would not come to trial until after Brooks was tried (November, 1974) that understanding did not come from "anybody in the prosecutor's office." He used the name "Louis" ". . . because I knew we was going in there to get the record player and stuff."[27]

He was asked whether anybody ". . . either from the State of Missouri or your attorney or any police officer" told him he would get "any special consideration" because "of your testifying here." His answer was "No." Then the following portions of the 1974 transcript were read:

"[Prosecutor]: Let me ask you flat out and frank out, do you expect any consideration, Mr. Craine?

A. Not really.

Q. [By the Court in the 1974 trial]: Have you got a hope that you will get some consideration? Do you have a hope in the back of your mind that you will get some consideration?

A. Your Honor, I guess everybody has a hope."[28]

The re-cross was then read. It revealed that from September 23, 1971 to August, 1974 Craine never reported anything that Brooks had done and it was not until after he was apprehended that he did so. He admitted that he had been through courts before, but, when asked, "And you know without being told by [the circuit attorney's] office or by your attorney that those people who testified get certain considerations," he answered, "No, I don't know."

Such was the transcript of Craine's testimony during the 1974 trial read to the jury.

■ As to appellant's second point, we conclude first that the court did not err, under the circumstances, in permitting Craine to exercise his Fifth Amendment privilege.

■ Craine had gone to trial in January, 1975 on the charge of robbery, not assault. At the conclusion of the State's case he withdrew his plea of not guilty and entered a plea of guilty and was sentenced to twelve years in the department of corrections. He was called as a witness for the State in this proceeding, but after exercising his privilege he was excused. In doing so, the court believed there was a possibility of an assault charge being placed against him. The court then permitted Craine's

26. The redirect examination revealed that the scar was on the "back of my head."

27. When asked how he knew that, he answered, "He [Brooks] asked me—he said he had been over there earlier that day—asked me if I wanted to go back over there with him to get a record player and I think it was a tape, TV or something."

28. While not read, the 1974 transcript reveals that the Court then responded, "Hope springs eternal in the human breast, doesn't it?" Craine answered, "Yes."

transcript testimony of the 1974 trial to be read to the jury.[29]

Craine's transcript testimony showed that after the choking of Miss Chestnut occurred he and Harper took the record player and the speakers, left the apartment and returned to the automobile. Whether there was one continuous affair or whether the robbery had been fully completed before the assault occurred could be viewed differently. Craine had pleaded guilty to the robbery charge only, and, at the time of the plea, there may well have been a possibility that Craine could have been subsequently charged with the offense of assault with intent to maim. In *State v. Richardson*, 460 S.W.2d 537, 540 (Mo. banc 1970) the Supreme Court stated that

> ". . . 'If there is but a single act of force proved as an essential element of the crime of robbery, then such act of force cannot be availed of as constituting the separate crime of assault, *but the rule is otherwise* where the existence of the distinct elements as realities is established, as where the force relied on to establish assault occurred after the robbery had been accomplished.'" (Emphasis added).

[19] The issue facing the trial court here, at the time the State called Craine as a witness and exercised his privilege of self-incrimination, was one that the trial court had to determine immediately. The court gave a broad interpretation to the privilege and excused Craine from testifying.[30] The court, confronted with the question whether to permit Craine to exercise his privilege, exercised its discretion and permitted him to do so. In doing so, under the circumstances, we cannot conclude that the trial court erred in permitting Craine to exercise his privilege.

Neither did the court err in permitting the transcript testimony to be read. Appellant contends that in doing so his constitutional right to confront and cross-examine Craine was violated. It is fundamental that an accused has the right to be confronted [31] with the witnesses against him. U.S.Const., Amend. VI; Art. I, sec. 18(a), Mo.Const.; *Pointer v. Texas,* supra. The reasons for the protection of the right of confrontation in criminal proceedings were stated in the case of *Mattox v. United States,* 156 U.S. 237, 15 S.Ct. 337, 39 L.Ed. 409 (1895):

> "The primary object of the constitutional provision in question was to prevent depositions or ex parte affidavits, such as were sometimes admitted in civil cases, being used against the prisoner in lieu of a personal examination and cross-examination of the witness, in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief. . . . " *Mattox v. United States,* supra, 15 S.Ct. at 339.

There are, however, recognized exceptions to this general principle.

---

29. Appellant contends that it is incongruous for the court to permit Craine to invoke his privilege on the one hand and then at the close of all the evidence "accept" the memorandum "permitting" the State to dismiss Count I. The court did not permit the State to dismiss the assault count. The prosecutor has the sole discretion to enter a nolle prosequi. *State v. Smith,* supra, 258 S.W.2d at 593–594. The State's position on the issue of dismissal was that there was a continuing offense of assault and robbery and that is the reason there was a dismissal. The State did object to Craine's exercise of his privilege but the court (not the State) concluded that there was a "possibility" of being charged with assault if he testified in this proceeding.

30. If a rational basis exists by which a witness' testimony might tend to incriminate him, and the court cannot find as a matter of law that *the testimony will not incriminate the witness,* he should not be compelled to testify. *State v. Cavanaugh,* 419 S.W.2d 929, 935 (Mo.App. 1967).

31. The right to confrontation and the right to cross-examine witnesses are synonymous and inseparable. *State v. Jackson,* 495 S.W.2d 80, 84 (Mo.App.1973).

"It is true that there has traditionally been an exception to the confrontation requirement where a witness is unavailable and has given testimony at previous judicial proceedings against the same defendant which was subject to cross-examination by that defendant. . . . This exception has been explained as arising from necessity and has been justified on the ground that the right of cross-examination initially afforded provides substantial compliance with the purposes behind the confrontation requirement. . . ." *Barber v. Page,* supra, 88 S.Ct. at 1320.[32]

▓▓▓ The courts have long recognized that former testimony of a witness who is deceased or otherwise unavailable is admissible against the defendant if the former testimony was given under oath in a prior judicial proceeding at which the defendant was present and afforded the opportunity to cross-examine the witness. *State v. Barnes,* 274 Mo. 625, 204 S.W. 267, 268 (1918). In these proceedings, Craine invoked his privilege and refused to testify. In so doing, he became "unavailable" as a witness. Exercising such a privilege has been held to make the witness unavailable at the subsequent trial.[33] *State v. Phillips,* 511 S.W.2d 841, 847 (Mo.1974) and cases cited therein. Craine testified in the 1974 trial; the defense was given the opportunity to and did cross-examine him in that trial; he was present. Defense counsel who tried the 1974 trial was the same counsel in these proceedings.

We hold, therefore, that the court did not err in admitting Craine's transcript testimony and that its admission under these circumstances did not violate the appellant's right of confrontation.

▓▓▓ Neither did the trial court err in admitting the transcript testimony because, as appellant contends, it deprived him of the opportunity to show that Craine may have been given some "consideration" in

exchange for his testimony in the 1974 trial and because he was deprived of the opportunity of showing changed conditions after his plea in January, 1975.

The record is convincing that no one offered Craine any consideration for his testimony in the 1974 trial. The record shows that neither his attorney, the State, nor the prosecutor offered him any consideration in return for his testimony. In the 1974 trial Craine was intensively examined and cross-examined on the issue of being given any consideration. His prior convictions were brought out. When the prosecutor asked him "flat out and frank out" whether he expected any consideration his answer was "not really" but that he "hoped." In this proceeding, before the court ruled on the Fifth Amendment privilege, Craine and his attorney were questioned about any consideration in exchange for his testimony. He and his attorney denied any "deals" were made. While he thought there was some "hope" that he would receive some consideration, this "hope" was subjectively determined and was not the result of any promises. When Craine appeared in person before the jury in this proceeding and prior to exercising his privilege in front of the jury, he admitted that he had pleaded guilty to the robbery charge and received a twelve-year sentence for robbery.

▓▓▓ The authorities recognize that, when the reliability of a material witness may well be determinative of the guilt or innocence of an accused, nondisclosure of evidence affecting his credibility falls within the rule that suppression or nondisclosure of such material evidence justifies a new trial. *State v. Collett,* supra, 526 S.W.2d at 931. We held in *State v. Brooks,* supra, 513 S.W.2d at 173, that

". . . [c]ourts have traditionally been cautious of convictions obtained upon the uncorroborated testimony of persons who have participated in the crime. . . . [F]or a jury to assess the credibility of a witness, it must be

---

**32.** See also 5 Wigmore, Evidence §§ 1395–1396, 1402 (Chadbourn rev. 1974); McCormick, Evidence §§ 252, 253, pp. 604–613 (2d ed. 1972).

**33.** McCormick, Evidence, supra, at 612; Annot., 45 A.L.R.2d 1354, 1355 (1956).

aware of facts which might cause a witness to be less than fully truthful or untruthful. The determination of that credibility is solely within the province of the jury and it is entitled to any information which might bear on that credibility."

But these principles are not violated here. The jury was aware that Craine had pleaded guilty before the transcript testimony was read; the jury was aware of the facts which might cause him to be less than truthful; the jury was provided an adequate basis from his personal testimony and the transcript testimony upon which to judge his credibility.

Appellant contends that the situation here is similar to that of Harper in the first trial in 1972 which we reversed. We do not find it so. The record in *State v. Brooks,* supra, indicated that there was a calculated attempt to foreclose defendant from eliciting relevant testimony and to keep the jury from having facts upon which to base its determination of Harper's credibility and therefore of defendant's guilt. There is no such lack of facts here. To the contrary, all the evidence indicated that no consideration was ever given Craine in exchange for his testimony and the jury was well aware that he pleaded guilty. Whatever "hope" Craine expected lay in his own heart and was not the result of any actions on the part of the State.

We conclude, therefore, that the court did not err in (1) permitting Craine to exercise his privilege against self-incrimination, (2) admitting, under the circumstances, the prior transcript testimony of the 1974 trial, and (3) denying the appellant his right of confrontation.

We therefore rule this point against appellant.

## VI

### Failure to Give Defense the Grand Jury Testimony of Dr. McKinney

As to his third point, appellant contends that the trial court in the 1974 trial erred in not granting a judgment of acquittal at the close of the State's case and erred in the 1972 case in not granting his motion for judgment of acquittal at the close of the entire case because he was not given the benefit of Dr. McKinney's grand jury testimony and thus, under the principles of *Brady v. Maryland,* supra, due process was violated. He contends, as we view it, that because the State did not furnish him the grand jury testimony of Dr. McKinney defendant was entitled to discharge in the 1972 and 1974 trials so that therefore he should not have been tried in 1975.

Implicit in this argument, and obliquely referred to, is that the State did not call Dr. McKinney as a witness although it had used him in the State's case in both the 1972 and 1974 trials and thus the defendant was deprived of his opportunity to cross-examine him as to his grand jury testimony.

". . . The State accomplished through Dr. Amin indirectly what it could not accomplish directly through the testimony of McKinney who would have been subjected to cross-examination. By using exclusively the testimony of Dr. Amin, the State did not run the risk of impeachment concerning very material and relevant matters in its case."

He argues that if the grand jury testimony had been provided to the defense prior to the 1972 trial no corpus delicti would have been established and defendant's motion for judgment of acquittal would have been sustained.

The thrust of these contentions is that the defendant should be discharged and these proceedings be reversed because the State failed to provide the defense with the grand jury testimony of Dr. McKinney prior to the 1972 trial and thus violated the principles of due process under the principles of *Brady v. Maryland,* supra.

Prior to the 1974 trial, requests for disclosure by both the State and the defendant were made in accordance with the new rules of criminal discovery. In accordance with Rule 25.32(A)(3), the State, prior to the 1974 trial, provided the defense with the grand jury testimony of Dr. McKinney.

Dr. McKinney's grand jury testimony in November, 1971 was somewhat in conflict with his testimony in the 1974 trial. During the 1974 trial Dr. McKinney testified that he examined the eyes of Miss Chestnut when she was brought to the hospital and performed surgery with Dr. Marion Allman to repair the lacerations. At that trial he testified that the lacerations of Miss Chestnut's eyes were "surgical in nature [34] and probably some type of deliberation" and that Dr. Amin assisted him in "subsequent followup." Before the grand jury in 1971 Dr. McKinney testified that he could not specifically state that the lacerations were intentional rather than accidental but that it would be " 'unique for flying glass or missile of some type to do this without intentional means but I can venture it is possible that flying glass of some type from an accident, a fall, would do this.' " He also was asked, " 'Can you suggest some other—others that might be possible other than a deliberate incision that would wound the eye?' " He answered by stating, " 'Maybe someone could walk into a glass ornament of some type, a window, but this would be rare to have it in both eyes in this manner.' "

As stated, Dr. McKinney indicated that it would be unique for flying glass or a missile of some type to do this without intentional means. He also indicated that it is a "possibility" that the lacerations would be caused by "flying glass" but it would be "very unique" or a "rare thing." His testimony indicated that the cuts were very neat.

The grand jury testimony, while somewhat inconsistent with his testimony in 1974, was more along the lines of what was the "possible" cause of the lacerations.

 We find the contentions raised in this point to be without merit. First, it is now well established that ". . . the

suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland,* supra, 83 S.Ct. at 1196–1197; *Moore v. Illinois,* 408 U.S. 786, 794, 92 S.Ct. 2562, 2568, 33 L.Ed.2d 706, 713 (1972); Annot., 34 A.L.R.3d 16 (1970). The tests of whether or not a reversal of a conviction should result are (1) whether the nondisclosed evidence had a reasonable likelihood of affecting the judgment of the jury, and (2) whether the evidence is material. *State v. Collett,* supra, 526 S.W.2d at 931.

 But, assuming that the testimony of Dr. McKinney in the 1972 and 1974 trials was contradictory and inconsistent with his grand jury testimony, the failure to provide favorable evidence would not, as appellant contends, entitle him to a complete discharge. In none of the decisions [35] which has dealt with the suppression issue was the defendant entitled to an outright discharge. In the event of failure to disclose favorable evidence a defendant at most is entitled to a new trial. But appellant had a new trial in 1974 and at that time he had the grand jury testimony. Dr. McKinney was cross-examined concerning it. That trial ended in a mistrial at the conclusion of the State's case. Appellant was then again tried in 1975. Hence he was furnished with such testimony and the principles of *Brady* and its progeny were not violated.

We conclude that the appellant is not entitled to be discharged.

 Second, as to appellant's subpoint that the "conflicting testimony of Dr. McKinney negates the establishment of a corpus delicti as to the blinding assault charge," we hold that it is without merit.

---

34. He testified in the 1974 trial that "[s]urgical in nature encompasses that you have a laceration applied to tissue that is unique, that is not jagged, and clean—in a description of cleancut, that is sharp edged and well placed and done in a manner that is least trauma to certain areas in terms that can be—if it were placed in a sensitive area it can be traumatic."

35. *Napue v. People of State of Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); *Brady v. Maryland,* supra; *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *State v. Thompson,* 396 S.W.2d 697 (Mo. banc 1965); *State v. Brooks,* supra.

Dr. McKinney's testimony was not necessary in this proceeding to establish the corpus delicti. There was sufficient evidence to establish the corpus. The hospital records, the personal observations of Dr. Amin, the testimony of Miss Chestnut and the surrounding facts were sufficient to establish that an assault had taken place and that the assault was caused by the criminal agency of someone. In proving the corpus delicti in a particular case, the reasonable rule is that only the best proof that is presently attainable need be shown. The corpus delicti can seldom be proved by direct and positive testimony. The elements of the corpus delicti may be proved by circumstantial evidence. See discussion, supra, at IV. There was sufficient evidence in the record to establish the corpus delicti.

Third, appellant's contention that the State accomplished indirectly through the testimony of Dr. Amin what it could not accomplish directly through the testimony of Dr. McKinney, who if he had testified would have been subject to cross-examination, is unmeritorious.

Prior to this proceeding the State deleted Dr. McKinney as an endorsed witness and did not call him in its case. The prosecutor stated:

". . . It became obvious from the examination of all the transcripts in this case that Dr. McKinney contradicted himself in the trial of 1972 from the testimony he gave in the Grand Jury room, and in view of that contradiction and in view of the fact that he is still sticking to the testimony he gave in the trial of 1972, it was my decision to delete Dr. McKinney because of the far extent of that contradiction and I did not want to put anybody on the stand and vouch for his credibility when he contradicted himself as wide and as broad as he did, and for no other reason."

Instead of calling Dr. McKinney, who examined and operated on Miss Chestnut, the State called Dr. Navin Amin, who first saw Miss Chestnut on the morning of September 24, 1971, the day after her admission. He did not participate in the surgery. The hospital records of Miss Chestnut were qualified under The Uniform Business Records As Evidence Law, §§ 490.660–490.690 RSMo, and offered and admitted without objection for the sole purpose of the Business Records Act. Dr. Amin testified that when he first saw Miss Chestnut she had already undergone surgery and observed that "[t]here was a laceration which means a cut involving the cornea in the right eye and the cornea involving the left eye and another laceration involving the right upper eyelid. . . ." He testified that he read the notes of Dr. McKinney and Dr. Allman which were admitted in evidence and that based upon reasonable medical certainty the lacerations he found on September 24 in both globes and the right upper lid were in the same condition they were when they were first examined and treated by Dr. McKinney and Dr. Allman. He further testified that he examined the eyes and from the examination and the "medical records" he diagnosed the right eye as having a "laceration—penetrating right globe and the right upper lid," and the left eye as having a "[p]enetrating injury involving cornea of the left eye." The doctor again examined the eyes in 1974 and found that "[t]here is no hope." "There is really no prognosis. She doesn't have any vision."

Dr. Amin described the extent and shape of the cuts stating that the incisions were completely within the globe of the eye and appeared to have been made by either "two strokes or . . . two objects." Defense counsel objected generally to Dr. Amin's testimony on the ground that Dr. Amin had not examined Wilma Chestnut's eyes upon her arrival at the hospital but only after she had undergone surgery and therefore his testimony could not be used to establish the condition of the eyes upon her arrival at the hospital on September 23, 1971. Thereafter, and in apparent response to defense counsel's objection, the prosecutor asked Dr. Amin whether he could state within reasonable medical certainty, based upon his own examination of the eyes and assuming that the notes made by Dr. McKinney and Dr. Allman were correct,

whether the lacerations on the eyes were in the same condition upon her arrival at the hospital as they were when he examined them on the following day. Dr. Amin responded in the affirmative.

 It has long been recognized that opinions of a physician may be drawn from facts which he has observed in the course of his examination and evidence which he has heard and read assuming that it is in the record and assuming it is true. 31 Am. Jur.2d, Expert and Opinion Evidence, § 112, pp. 649–650 (1967); Annot., 66 A.L.R.2d 1082, 1097–1098 (1959); *State v. Linders*, 224 S.W.2d 386, 391 (Mo.1949). Dr. Amin had sufficient information to form an opinion. In the instant case his testimony was based upon his own personal examination on September 24, 1971. From his own examination and the medical reports he gave his opinion that the lacerations were in the same condition they were when they were first treated by Dr. McKinney and Dr. Allman. He gave his opinion that the lacerations were caused by either "two strokes or . . . two objects."

 Fourth, the State was not obliged to call each and every witness who might be able to provide testimony. *State v. Napolis*, supra, 436 S.W.2d at 649–650. Under the circumstances here there is no prejudice in deleting Dr. McKinney as an endorsed witness or in not calling him. There may well have been prejudice if his grand jury testimony had never been given to the defense. But the grand jury testimony was made available prior to the 1974 trial and was available to the defense in the 1975 trial.

We rule this point adverse to appellant.

## VII

### *The Sentence*

Lastly, appellant contends that the trial court erred in assessing punishment on the robbery charge for which he was found guilty because the sentence exceeded the punishment he had received on the robbery count in the 1972 proceedings. He therefore contends that even though he was sentenced to a total of a fifty-five year term in 1972 (fifty-five years on the assault count and fifteen years on the robbery count to run concurrently) the trial court below was limited to a sentence on the robbery count alone to fifteen years. By imposing sentence in excess of fifteen years appellant argues he was denied due process of law in that the increased sentence penalized him for successfully appealing his 1972 conviction. He relies only upon *North Carolina v. Pearce*, supra.

On June 2, 1975, the assessment of punishment took place. The court informed counsel that "I have determined as far as my interpretation of the restrictions on *North Carolina v. Pearce* is based upon the facts in this case that the limitation is 55 years." The court filed a memorandum opinion.[36]

On June 3, 1975, appellant filed his motion for new trial, and on June 12, 1975, the motion was heard and argued. On the argument of the motion, the court indicated that in assessing punishment it "did take

---

**36.** The memorandum opinion restated the facts of the 1972 trial in which the defendant was sentenced to fifteen years on the robbery charge and fifty-five years on the assault count. The court stated that ". . . there has been no showing of conduct of the defendant subsequent to the first sentencing procedure to require an increased sentence. Absent this showing, the present judge is limited to a sentence no greater than the first sentence." Although defendant contends that the court is restricted to imposing a sentence no greater than fifteen years according to his interpretation of *Pearce*, no authority is cited and other courts have interpreted *Pearce* as this court does. *Baggett v. State*, 302 So.2d 206, 207 (Fla.App.1974); *Taylor v. United States*, 475

F.2d 1121, 1123 (6th Cir. 1973). There is nothing ". . . explicit in the reasoning nor necessarily implicit in the holding or rationale of the noted *Pearce* progeny to support defendant's interpretation and proposed application of the *Pearce* decision."

"Absent the *Pearce* case, this Court would be empowered by the statutes and laws of this state to sentence defendant Brooks on the robbery charge from a minimum of 5 years imprisonment to a maximum of imprisonment for life. However, because of the *Pearce* decision and the prior sentence here of 55 years, the maximum sentence is now limited on the robbery charge to 55 years."

into consideration the evidence of the assaultive behavior." It was the court's position, contrary to counsel for defendant, that *North Carolina v. Pearce,* supra, does not require that a sentence given on one count in a previous trial be limited to that particular count. The court made clear that the trial judge who sentenced the appellant in the 1972 case

". . . took into consideration the overall extent of the original charge in multiple counts and he also took into consideration the testimony and evidence relevant to each of these charges as well as considering whether the sentences should be imposed consecutive or concurrently. He did not make the sentences consecutive, . . . but rather the major penalty was meeted [sic] out to fit the serious assaultive behavior proved to the jury beyond a reasonable doubt in Count I. The sentence in Count II being at that time separate from the assault, a less serious penalty was imposed to run concurrently."

". . . To read *Pearce* as you would have it would require this Court to be restricted to a sentence which was made, as I understand it, for reasons which are no longer valid at this time. . . ."[37]

The court overruled the motion for new trial and sentenced defendant to fifty-five years for the offense of robbery in the first degree.

Prior to the landmark decision of *North Carolina v. Pearce,* supra, it was the majority view that it was permissible to impose upon a defendant at a new trial a more severe punishment than was imposed upon an earlier conviction. *Stroud v. United States,* 251 U.S. 15, 40 S.Ct. 50, 64 L.Ed. 103 (1919); cases collected in Annot., 12 A.L. R.3d 978, 980 (1967). The more severe punishment after a retrial did not violate dou-

ble jeopardy. The issue was again raised in *North Carolina v. Pearce,* supra.

"When at the behest of the defendant a criminal conviction has been set aside and a new trial ordered, to what extent does the Constitution limit the imposition of a harsher sentence after conviction upon retrial? That is the question presented by these two cases." *North Carolina v. Pearce,* supra, 89 S.Ct. at 2074.

*Pearce* involved two cases. Pearce was convicted in North Carolina upon a charge of assault with intent to commit rape. He was sentenced by the judge to a term of twelve to fifteen years. Several years later he initiated state post-conviction proceedings which culminated in reversal upon the ground of an involuntary confession. He was retried and again sentenced by the trial judge to an eight-year term, which, when added to the time he had already served, a longer total sentence was imposed. The increased sentence was affirmed on appeal to the state court. Pearce initiated habeas corpus proceedings in the federal system. The district court held that the longer sentence was unconstitutional. The order was affirmed by the court of appeals.

The other petitioner in *Pearce* was William S. Rice. Rice pleaded guilty in Alabama to four separate charges of second degree burglary. He was sentenced to terms aggregating ten years.[38] A few years later the convictions were set aside on the ground that Rice was not accorded his constitutional right to counsel. He was retried upon three of the charges and sentenced to prison terms aggregating twenty-five years.[39] He then brought habeas corpus proceedings in the federal system. The district court held that the conclusion is inescapable that Alabama is punishing petitioner for his having exercised his post-conviction right of review.

---

**37.** Defense counsel inquired of the court whether the "increased punishment . . . was in no way related to any behavior or conduct on the part of the defendant from the time of the original sentence [1972] until the time of the present assessment . . . ." The court replied, "Absolutely not, and it was put in my memorandum."

**38.** Four years on the first count, two years on each of the other three counts, to run consecutively.

**39.** Ten years on the first count, ten years on the second count, and five years on the fourth count, to run consecutively. The third count was dropped.

The Supreme Court addressed the issue of ". . . what constitutional limitations there may be upon the general power of a judge to impose upon reconviction a longer prison sentence than the defendant originally received." *North Carolina v. Pearce,* supra, 89 S.Ct. at 2077. The court held that the guarantee against double jeopardy imposes no restrictions upon the length of a sentence imposed after a reconviction, and at least since 1919 ". . . it has been settled that a corollary of the power to retry a defendant is the power, upon the defendant's reconviction, to impose whatever sentence may be legally authorized, whether or not it is greater than the sentence imposed after the first conviction." *Id.* at 2078. The court also held that the Equal Protection Clause does not bar a more severe sentence. "We hold, therefore, that neither the double jeopardy provision nor the Equal Protection Clause imposes an absolute bar to a more severe sentence upon reconviction." *Id.* at 2079. But that does not end the inquiry. ". . . There remains for consideration the impact of the Due Process Clause of the Fourteenth Amendment." *Id.* at 2080. The court stated that it would be a "flagrant violation" for a state trial court to follow an announced practice of imposing a heavier sentence upon every reconvicted defendant for the explicit purpose of punishing him for succeeding in getting the original conviction set aside. "A court is 'without right to * * * put a price on an appeal. . .'" *Id.* at 2080.

"Due process of law, then, requires that vindictiveness against a defendant for having successfully attacked his first conviction must play no part in the sentence he receives after a new trial. . . .

In order to assure the absence of such a motivation, we have concluded that whenever a judge imposes a more severe sentence upon a defendant after a new trial, the reasons for his doing so must affirmatively appear. Those reasons must be based upon objective information concerning identifiable conduct on the part of the defendant occurring after the time of the original sentencing proceeding. And the factual data upon which the increased sentence is based must be made part of the record, so that the constitutional legitimacy of the increased sentence may be fully reviewed on appeal." *Id.* at 2080–2081.

The court affirmed the lower courts in both *Pearce* and *Rice* because the State offered no reason or justification beyond the "naked power" to impose the increased sentences.[40] Subsequent decisions indicate that the primary purpose of the *Pearce* prophylactic rule was to guard against vindictiveness for having exercised rights of appeal. See *Chaffin v. Stynchcombe,* supra, 93 S.Ct. at 1982.

In analyzing the decisions of the Supreme Court, we hold that the court below did not

**40.** In later decisions, the Supreme Court has dealt with the *Pearce* rule. In *Colten v. Commonwealth of Kentucky,* 407 U.S. 104, 92 S.Ct. 1953, 32 L.Ed.2d 584 (1972), the court held the two-tier system whereby a defendant convicted in an inferior court could obtain a trial *de novo* in a court of general jurisdiction did not deny due process even though a greater penalty was imposed. *Colten* stated that *Pearce* was a "prophylactic rule" to ensure that vindictiveness plays no part in the resentence. In *Chaffin v. Stynchcombe,* 412 U.S. 17, 93 S.Ct. 1977, 36 L.Ed.2d 714 (1973) it was held that the rendition of a higher sentence by a *jury* on retrial does not offend due process as long as the jury is not informed of the prior sentence and the second sentence is not otherwise shown to be the produce of vindictiveness. In *Michigan v. Payne,* 412 U.S. 47, 93 S.Ct. 1966, 36 L.Ed.2d 736 (1973) it was held that the *Pearce* prophylactic rule was not retroactive.

In *Payne,* the court stated that ". . . [t]he *Pearce* restrictions serve to ensure that resentencing decisions will not be based on improper considerations, such as a judge's unarticulated resentment at having been reversed on appeal, or his subjective institutional interest in discouraging meritless appeals. . . ." 93 S.Ct. at 1969. In *Moon v. Maryland,* 398 U.S. 319, 90 S.Ct. 1730, 26 L.Ed.2d 262 (1970), the defendant was sentenced on retrial to a longer term for an offense. The attorney never contended that the judge was vindictive. The writ of certiorari was dismissed as improvidently granted.

In *State v. Johnson,* 485 S.W.2d 106, 112–113 (Mo.1972) it was held that the *Pearce* rule did not apply when the second increased sentence was imposed by the jury.

err in imposing the fifty-five year sentence for the offense of which he was found guilty by the jury—robbery in the first degree.

The whole thrust of the *Pearce* prophylactic rule is to ensure that (1) vindictiveness plays no part in a judicial resentencing process, (2) the resentencing decision will not be based upon improper considerations such as the unarticulated resentment of the sentencing judge, (3) the State does not exercise "naked power" to impose a more severe sentence, and (4) the defendant's rights of appeal are not chilled. *Pearce* and its progeny are not dispositive of the sentence imposed here by the trial judge. *Pearce* and its progeny and appellant's due process rights were not violated under these circumstances.

First, in both *Pearce* and *Rice* the total sentence on reconviction exceeded the total sentence on the first conviction. That is not the situation here. The appellant in the 1972 trial was sentenced to fifteen years on the robbery count and fifty-five years on the assault count to run concurrently—a total of fifty-five years. The trial judge here did not exceed this aggregate total. Under *Pearce*, the trial court could not legally have imposed a greater sentence than fifty-five years in the absence of "objective information concerning identifiable conduct on the part of the defendant occurring after the time of the original sentencing proceeding." 89 S.Ct. at 2081.

Where the precise issue as to counts has arisen in other jurisdictions it has been held that where the defendant has been tried and sentenced on multiple counts and is then resentenced and receives a different sentence on each viable count, but receives no greater sentence than the total sentence originally received, there is no violation of *Pearce*. *Baggett v. State*, supra, 302 So.2d at 207; *Taylor v. United States*, supra, 475 F.2d at 1123.[41]

Second, after a careful review of this record, there is no unarticulated vindictiveness violative of the *Pearce* rule in the sentence imposed by the trial court. There is no unarticulated resentment at having been reversed on appeal. The trial court in this instance was not the same judge who imposed the 1972 sentence. The trial court in this proceeding recognized that it was precluded from imposing a sentence which exceeded the total sentence in the 1972 trial, but, because of the seriousness of the offense, imposed a sentence within the range of punishment and within the limits of the sentence received in the 1972 trial.

Third, although *Pearce* held that when a judge imposes a more severe sentence after a new trial he must set forth the reasons for doing so which must be based on objective information concerning conduct occurring after the time of the original sentence, this principle must be read in the context of *Pearce* and is applicable to situations where the trial judge imposes a greater sentence than that received in the first trial. Here the sentence did not exceed the aggregate sentence received in the 1972 trial.

Fourth, this was not a situation as in *Pearce* and *Rice* of "naked power" on the part of the State. The trial court recognized its limitations and imposed a sentence which it believed to be commensurate with the evidence and the offense for which appellant was found guilty.

Fifth, the sentence imposed by the trial court was not a "more severe" sentence than was imposed in the 1972 trial as that term is used in *North Carolina v. Pearce,* supra. In *McCulley v. State,* 486 S.W.2d 419, 424 (Mo.1972), it was stated:

"... In cases coming on for a second sentencing following the decision of the United States Supreme Court in *North Carolina v. Pearce,* supra, (June 23, 1969) and where the second punishment is assessed by a judge rather than a jury, the second sentence cannot be longer than the first sentence except in those instances where the exception noted in *North Carolina v. Pearce* is present."

---

41. *Cf. Commonwealth v. Pearson,* 450 Pa. 467, 303 A.2d 481 (1973).

■ In this proceeding the fifty-five year sentence did not exceed the sentence imposed after the 1972 trial in violation of the *Pearce* rule. As the trial court remarked concerning the 1972 sentence, ". . . the major penalty was meeted [sic] out to fit the serious assaultive behavior proved to the jury beyond a reasonable doubt . . . The sentence [for the robbery] being at that time separate from the assault, a less serious penalty was imposed to run concurrently." In this proceeding, while the assault charge was dismissed, the evidence of the assault was relevant and admissible on the robbery charge. And since the punishment imposed in the 1972 and 1975 trials was based upon a totality of the evidence in each trial, the sentence imposed below which did not exceed the punishment imposed in the 1972 trial was not "more severe" as that term is used in *Pearce*.

We conclude, therefore, that the trial court in imposing the fifty-five year sentence for robbery did not violate *Pearce* and did not violate the due process rights of the appellant. We further conclude that the trial court did not violate the due process rights of appellant because the sentence on the robbery count on retrial exceeded the sentence on the robbery count in the 1972 trial.

This point is therefore ruled against appellant.

## VIII

### Conclusion

So we conclude this complicated and fascinating case. We have found no prejudicial error.

We conclude (1) that the trial court did not err in failing to declare a mistrial when the State entered a nolle prosequi as to the assault count at the end of the case, (2) that the trial court did not err in permitting Mr. Craine to invoke his Fifth Amendment privilege or in permitting his transcript testimony to be read to the jury, (3) that there was no error in the trial court's failure to sustain a motion for judgment of acquittal in the 1972 and 1974 trials, and (4) that the sentence imposed did not violate the appellant's due process rights.

We have read and studied the entire voluminous transcripts thoroughly; we have read the briefs filed by the parties and all the authorities relied upon therein; we have done our own independent research into all the legal issues involved; and we are convinced that there is no prejudicial error and that the judgment of conviction should be affirmed.

The judgment is affirmed.

KELLY, J., concurs in separate opinion.

GUNN, J., concurs.

KELLY, Judge, concurring.

I concur in the result reached in this appeal, but I have some difficulty with that portion of the opinion which, in disposing of appellant's third Point Relied On, considers appellant's claim that the State was permitted to enjoy the benefit of the record entries made by Dr. Reginald McKinney in the Homer G. Phillips Hospital records in framing a hypothetical question propounded to Dr. Amin seeking an opinion from him concerning the nature of the lacerations in Miss Chestnut's eyes at the time of her admission to the Hospital. The thrust of appellant's contention was that the State accomplished indirectly through the testimony of Dr. Amin what it could not accomplish directly through the testimony of Dr. McKinney, who, if he had testified, would have been subject to cross-examination. This contention was found to be without merit; and with this holding I have no argument. I do, however, find it necessary that my concurrence in the result be expressed in a separate concurring opinion for two reasons. First, I am of the firm opinion that this issue has not been properly preserved for review and Secondly, if I am in error in that conclusion, then I believe that the opinion holding this point to be without merit has failed to consider and dispose of the most pertinent argument of appellant in support of his position.

Appellant's third Point Relied On is that the trial court erred in overruling his motion for judgment at the close of the State's case and at the close of the entire case filed in both the 1972 and the 1974 trials. As sub-points he contends (1) that the presentation of the testimony of Dr. McKinney in 1972 by the prosecution with full knowledge that he had given prior inconsistent sworn testimony before the Grand Jury and the failure to furnish that testimony before the Grand Jury to the defendant constituted a *Brady v. Maryland* violation and (2) that the conflicting testimony of Dr. McKinney negates the establishment of a corpus delicti as to the "blinding assault charge."

The opinion disposes of appellant's first sub-point, and I concur in this disposition. The second sub-point is inappropriate in that this appeal is from a conviction of robbery in the first degree. The "blinding assault charge," Count I of the Indictment, was dismissed by the State at the conclusion of all of the evidence. There can be no appeal from that Count. Thus, it is my humble opinion that whether Dr. McKinney's "conflicting testimony" negates the establishment of a corpus delicti of the charge alleged in Count I of the Indictment becomes irrelevant and immaterial to the merits of this appeal from a jury verdict and conviction on Count II of the Indictment. What we have done, I conclude, in attempting to dispose of argument interposed in support of this Point, is to excise from Point Third what might more properly have been presented in support of appellant's Point One with respect to admission of irrelevant and highly inflammatory evidence of an assault which the State subsequently dismissed.

We have, correctly, I believe, found no merit to appellant's Point One for the reasons stated. However, I believe that it is unnecessary to this opinion to consider and dispose of the appellant's contention that the State accomplished indirectly what it could not do directly, with respect to Dr. McKinney's findings for reasons heretofore stated.

In gratuitously considering appellant's argument that he was deprived of his right to confront and cross-examine Dr. Reginald McKinney under this Point and finding it to be without merit will, I fear, encourage what I consider to be a practice of dubious validity, unless it is made clear that the Point is without merit only because not properly preserved and was not reached on the merits for that reason.

The opinion of the court in ruling this Point applied the rule of evidence that opinions of a physician may be drawn from facts which he has observed in the course of his examination and evidence which he has heard and read *"assuming that it is in the record and assuming it is true."* However, what the opinion fails to point out is that the information upon which Dr. Amin was permitted to form his opinion included a record entry made by a physician whose credibility the State refused to stand behind. It was for this reason that the State used the vehicle of the Homer G. Phillips Hospital record entry made by Dr. McKinney to get before the jury his impressions and findings when he examined Miss Chestnut's eyes on September 23, 1971, on admission, without subjecting him to the vagaries of confrontation and cross-examination.

The record entries made by Dr. McKinney were incorporated into the hypothetical question propounded to Dr. Amin and he necessarily based his opinion upon those record entries that the lacerations he observed the day following Miss Chestnut's admission and after she had undergone surgery were the same lacerations observed by Dr. McKinney. The validity of Dr. Amin's opinion is dependent in part at least upon the integrity of Dr. McKinney's record entries of September 23, 1971. This is the same Dr. McKinney the State refused to produce as a State's witness in persona since it would not vouch for his credibility because he would thereby be exposed to cross-examination with respect to the contradiction in his testimony before the Grand Jury which returned this Indictment and his testimony at the two prior trials with respect to the question of whether the lacerations in Miss Chestnut's eyes were delib-

erate in nature. Whether the lacerations were deliberately inflicted was an issue in the assault case at that time. It was not until later that this Count was dismissed.

The divisional opinion approves reception into evidence of the record entries made by Dr. McKinney by reason of the Uniform Business Records As Evidence Act, §§ 490.-660–490.690 RSMo.1969, and states that the hospital record was qualified thereunder, offered and admitted into evidence without objection for the sole purpose of the Business Records Act. The hospital record was not received for all purposes. This conclusion is further fortified by the conference in chambers which almost immediately followed the offer and acceptance of the hospital record into evidence, wherein appellant's trial counsel directed his objections to Dr. Amin testifying concerning the condition of Miss Chestnut's eyes at the time of her admission into the hospital since he admittedly did not see her until the following day. It was during this conference that Mr. Fredericks, the State's trial counsel, stated that it was his intention to have Dr. Amin "review the hospital records and see if he recognizes the signature of Dr. McKinney and those things Dr. McKinney wrote in the record upon his findings in initial examination." When this was accomplished, the prosecutor proposed to have Dr. McKinney's entries read into the record "so it would be part of the hypothetical presented to Dr. Amin." Appellant's trial counsel objected to this procedure on the grounds it would deny him his right to confrontation and cross-examination.

The Uniform Business Records As Evidence Act does not make admissible that which otherwise would be inadmissible. *Stewart v. Sioux City & New Orleans Barge Lines, Inc.*, 481 S.W.2d 205, 210[12] (Mo.1968). It is no grounds for objection to the admissibility of a hospital record qualified under the Act that it deprives a defendant of his constitutionally guaranteed right to confrontation secured by Art. 1, Sec. 18(a) of the Constitution of Missouri, 1945. *State v. Durham*, 418 S.W.2d 23, 29–31[14–21] (Mo.1967). See also, Anno. 69 A.L.R.3rd 22, Admissibility under business entry statutes of hospital records in criminal case. Therefore the trial court properly overruled this objection.

However, throughout these discussions ran the thread that the State was attempting to do indirectly what it could not, or would not, do directly; i. e. obtain evidence of a witness for whose testimony it would not vouch. It is this situation I believe to be one where the Business Records Act may not make admissible that which would otherwise be inadmissible. *Stewart v. Sioux City & New Orleans Barge Lines, Inc.*, supra.

My colleagues, in their opinion, have approved the method employed by the State whereby the opinion of Dr. Amin on a condition he did not observe was elicited by use of a hypothetical question incorporating record entries made by Dr. McKinney. As they have also recognized, the rendering of an opinion under those circumstances assumes that the information furnished the physician used in formulating his opinion was in the record *and* "is true." The incongruity of the procedure used by the State in its effort to get before the jury the findings of Dr. McKinney without producing him as a State's witness should now be evident. On the one hand, the State contends Dr. McKinney's entry in the hospital record is true; on the other hand, the State refuses to call him as a witness because it will not vouch for his credibility. The State would enjoy the verity of the record entry extended to records made in the regular course of the business of the hospital by reason of the Uniform Business Records As Evidence Act to get into evidence the opinion of Dr. Amin based in part on the hospital record entry made by a physician for whose credibility it will not vouch. This question the opinion of the court did not resolve.

For the aforesaid reasons, although I concur in the result reached, I cannot concur in the reasoning employed to pass upon a Point, or sub-point, I do not believe was ripe for decision because not properly preserved for review by this court.